OPINION
{¶ 1} Defendant-appellant Ronald Pahlau appeals from his convictions and sentences in the Stark County Court of Common Pleas on three counts of aggravated arson in violation of R.C.2909.02 (A)(2), felonies of the second degree. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND THE CASE {¶ 2} On July 24, 2005, Harold Boyd lived at 707 4th
Street N.E., Massillon. Boyd is a friend of appellant Ronald Pahlau, and the two lived together in the past. On the weekend of July 24, 2005, Boyd was out of town and spent the night away from his residence. Boyd returned the next morning to find his home burned and his fire-damaged possessions lying in his front yard.
 {¶ 3} Gwendolyn Miller lives at 703 4th Street N.E. Around 1:30 a.m. on July 24, 2005, Miller was still awake in her bedroom, reading a book. Upon hearing a lot of noise Ms. Miller went to her front door. Miller saw flames on the windows of the house across the street and called 911. Miller later realized that what she saw was a reflection, and that the fire was actually burning at the residence next door to hers. Heat from the fire broke two windows and damaged the gutters, gutter guards, and roof of Miller's residence.
 {¶ 4} Heidi Catron had only lived at 704 4th Street N.E. for a short time, and was at home on July 24, 2005. Around 1:30 a.m., Catron came downstairs and looked outside. She saw that a man was across the street, pounding on Harold Boyd's front door. Catron did not find this to be an unusual situation, and assumed that the man and Boyd were probably both intoxicated and the situation would resolve itself as it had many times before. Catron heard the man yelling something to the effect of "You're going to let me in or you're going to pay for this."
 {¶ 5} When Catron heard the remarks become threatening, she went back downstairs and looked outside, only to see Harold Boyd's entire front porch in flames. The man was no longer anywhere in sight, nor was anyone else. Catron called 911.
 {¶ 6} At trial, Catron described the man that she saw standing on Boyd's porch. The man had dark brown or black hair and was wearing a white t-shirt. Catron only saw the man's upper half from her vantage point. Catron had a clear view of the man because he was illuminated by a spotlight on a neighbor's house. She had never seen him before. Catron also described the man as highly intoxicated because he spoke very loudly and slurred his words.
 {¶ 7} Delilah Hoffman is a long-term resident of the neighborhood, and lived at 711 4th Street N.E. on July 24, 2005. Hoffman awoke around 1:30 a.m. to the sound of someone pounding on Harold Boyd's door. When she looked out, Hoffman observed a man with a dog. The man was mumbling and sounded angry; she heard him say something to the effect of, "Harold, you [expletive], you'd better let me in." Hoffman was afraid that the man's yelling would wake her daughter up, so she went into her bedroom to check on her. Hoffman noted that the time was 1:32 a.m.
 {¶ 8} Hoffman lay back down, but then heard what she described as a "scurrying noise," and then a "popping sound" that sounded like rocks being thrown. Hoffman sat back up, intending to call the police, and saw flames. She screamed and awakened her husband, and then called 911. Hoffman later testified that after the voice had stopped yelling, she heard the "popping" sound about twenty second later.
 {¶ 9} Hoffman had seen this man before, also at Harold Boyd's house. It was not unusual for Boyd and this man to argue loudly, and Hoffman had seen the man escorted away in a police car on previous occasions. Hoffman's husband had spoken to the man before, but Hoffman had not. Hoffman had a clear view of the man and the dog because of a security light above her bedroom window which illuminated Harold Boyd's front yard and porch. Hoffman described the dog as a boxer-pit bull mix, tan and white in color.
 {¶ 10} Three houses sustained extensive damage in the fire. Harold Boyd's residence (707 4th Street N.E.) was destroyed; the fire investigators estimated the damage at $20,000 to the house and $10,000 for the contents. Gwendolyn Miller's residence (703 4th Street N.E.) had two cracked windows and damage to the gutters, gutter guards, and parts of the roof. Delilah Hoffman's residence (711 4th Street N.E.) sustained extensive damage to the siding; Hoffman described the side of her house facing Boyd's as "melted." The entire residence would have to be re-sided, and Hoffman received $6800 from her homeowner's insurance for a portion of the damage.
 {¶ 11} Captain Jerry Layne is the Fire Marshall for the City of Massillon. The fire was originally reported at 1:43 a.m.; Layne was called to the scene at 2:55 a.m. By that point, the fire crew that initially responded had already battled the flames of the "pretty intense fire."
 {¶ 12} Layne's purpose was to determine the cause of the fire. He walked through the building and took photographs of the damage, working from the least-burnt areas of the residence to the most-burnt areas, a process designed to lead him to the fire's point of origin. In this case, Layne determined that the fire started on the front porch. He based this upon the "low burn patterns" on the porch. Layne also found evidence that an accelerant had been used. He submitted samples of the accelerant to the Stark County Crime Lab, which determined that the substance was charcoal lighter fluid or something similar.
 {¶ 13} Layne also discovered a metal gasoline can on the front porch in an area where the porch itself was "pretty burned out." The can was upside down when Layne found it. Layne noted that the pattern of the fire also indicated that an accelerant had been used; there was a "lot of fire" and the fire was "very hot and quick." Ultimately, Layne determined that the fire at the residence was an arson fire.
 {¶ 14} Once the fire was determined to be arson, Detective Bobby Grizzard of the Massillon Police Department began an investigation. Grizzard arrived at the fire scene around 2:50 a.m. and spoke with the witnesses. Based upon those conversations, Detective Grizzard obtained a description of the suspect; a man wearing a white tank top and jeans-type pants. Detective Grizzard identified the suspect as appellant because appellant fit the description and was known to be a frequent visitor to Boyd's address.
 {¶ 15} Detective Grizzard immediately went to appellant's residence to speak to him. Appellant lives on Lake Street N.W., at an address which is 1.1 miles from the scene of the fire. Appellant does not own a car and generally walks everywhere he goes. When Grizzard pulled into the driveway, Appellant began screaming out the window, "Who's there?" Detective Grizzard waited for a uniformed officer to arrive and knocked on the front door. Appellant answered, wearing a pair of "jeans pants" which he said he had been wearing all night. He also appeared to be intoxicated. Detective Grizzard asked him to turn over the rest of the clothes he had been wearing, and appellant produced a white tank-top style shirt and the jeans shorts.
 {¶ 16} Detective Grizzard told appellant that there had been a fire at the Boyd residence. Appellant denied that he had been at the fire scene. He stated that he had been at the home of someone named Deckard that evening that he left Deckard's after 1:00 a.m. and arrived home shortly before the "Big Chuck L'il John Shown" ended. Detective Grizzard determined that this television program ended at 2:30 a.m. Deckard's residence is 727 First Street N.E., which is three-tenths of a mile from the fire scene. Appellant stated that while he was at Deckard's, people were talking about a commotion "up on the hill" with fire trucks.
 {¶ 17} Detective Grizzard's investigation determined that appellant left Deckard's around 1:17 a.m. Detective Grizzard walked the distance from Deckard's residence to the fire scene, which took four minutes and fifty-five seconds.
 {¶ 18} Appellant's clothes from that evening were submitted to the Stark County Crime Lab, and the clothes were found not to contain any evidence of accelerant. Crime lab personnel acknowledged that even if a person was in the vicinity of a fire, though, the lab would only find accelerant on clothing if that accelerant had been spilled upon or otherwise came into contact with the clothing.
 {¶ 19} Detective Grizzard also prepared a photo line-up and showed it to Delilah Hoffman. She picked out appellant as the man she saw on Harold Boyd's porch. She also identified appellant's dog as the one she saw before the fire.
 {¶ 20} Detective Grizzard advised appellant that a witness placed him at the scene of the fire. Appellant called detective Grizzard several times and left messages for him, wanting to know about the progress of the investigation and stating that he hoped that Detective Grizzard would "do the right thing." Appellant agreed to come in to speak with Detective Grizzard again. This interview was videotaped. In their first conversation, appellant said that he left Deckard's a little bit after 1:00 a.m., but now he claimed that he left a little after 2:00 a.m.
 {¶ 21} Appellant was charged by indictment with three counts of aggravated arson pursuant to R.C. 2909.02 (A)(2); each count is a felony of the second degree.
 {¶ 22} A jury found appellant guilty as charged. Appellant was sentenced to three concurrent five-year prison terms.
 {¶ 23} Appellant timely appealed and submits the following assignment of error for our consideration:
 {¶ 24} "I. THERE WAS INSUFFICIENT EVIDENCE TO FIND THE APPELLANT GUILTY OF THREE COUNTS OF AGGRAVATED ARSON AND HIS CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 25} In his sole assignment of error, appellant maintains the verdict was against the sufficiency and manifest weight of the evidence. We disagree.
 {¶ 26} Our standard of reviewing a claim a verdict was not supported by sufficient evidence is to examine the evidence presented at trial to determine whether the evidence, if believed, would convince the average mind of the accused's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St. 3d 259.
 {¶ 27} The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.
 {¶ 28} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice. State v. Thompkins
(1997), 78 Ohio St. 3d 387, citations deleted. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment."State v. Thompkins, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App. 3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weight their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St. 2d 230, syllabus 1.
 {¶ 29} Appellant contends that the evidence fails to prove any specific act on his part which caused the fire. The only element in dispute at trial was the identity of the individual who started the fire.
 {¶ 30} As this court noted "[o]ften, in arson cases, there is no eyewitness to the arson. Courts in this state have consistently found that circumstantial evidence can be sufficient to sustain an arson conviction. State v. Zayed (Aug. 7, 1997), Cuyahoga App. No. 71039; State v. Wills (June 5, 1997), Cuyahoga App. No. 70988; State v. Weber (Dec. 23, 1997), Franklin App. No. 97APA03-323; State v. Alba (June 2, 1995), Sandusky App. No. S-94-018; State v. Wright (Dec. 30, 1994), Crawford App. No. 3-92-24. `Of necessity, proof of arson must often rely heavily on circumstantial evidence because of the nature of the crime. But, as in all crimes, circumstantial evidence may establish any given element of the offense. Motive and opportunity are facts which can weigh heavily in establishing arson.' State v. Hoak (Aug. 9, 1995), Lorain App. No. 94CA005917, quoting State v. Shaver (Dec. 20, 1989), Lorain App. No. 89CA0004505 at 7. Thus, in the present case `[t]he state was not required to introduce into evidence the testimony of someone who actually witnesses [the defendant] * * * set the fire.' State v. Hoak, supra. Rather, `[t]he element of knowledge required for a finding aggravated arson can be established by circumstantial evidence.' Id.
 {¶ 31} "As for the evidence pertaining to whether or not appellant started the fire, admittedly the evidence is circumstantial in nature. We note `circumstantial evidence may be more certain, satisfying and persuasive than direct evidence.'State v. Richey, 64 Ohio St. 3d 353, 363, 595 N.E. 2d 915,1992-Ohio-44. Under Ohio law, circumstantial evidence and direct evidence inherently possess the same probative value. State v.Jenks (1991), 61 Ohio St. 3d 259, 272, 574 N.E. 2d 492, 502-503. Thus, whether considering circumstantial or testimonial evidence, `a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous evidence inference.' Holland v. United State (1954),348 U.S. 121, 140, 75 S. Ct. 127, 138, 99 L. Ed. 150, 167. In both instances, `the jury must use its experience with people and events in weighing the probabilities.'" Id. State v. Hall,5th Dist. No. 2004-CA-0093, 2004-Oiho-4403 at ¶ 31-32.
 {¶ 32} In the case at bar, the State presented evidence that appellant and Mr. Boyd, the resident of the home where the fire occurred, are acquaintances. (1T. at 145). Appellant and Mr. Boyd had lived together at the home in the past. (id.). Appellant continued to visit the residence during the time Mr. Boyd lived there. (Id. at 146-148). At least one witness recognized appellant from the earlier visits. (1T at 207; 209; 211-212).
 {¶ 33} Eyewitnesses placed appellant on the front porch of the residence shortly before they noticed the fire. (1T. at 185-93; 210; 213-14). Appellant's picture was selected from a photo lineup by one witness. (1T. at 218-20; 243-45). No other person was observed in the area of the residence during the time prior to the start of the blaze. (Id. at 210-11). Appellant admitted to wearing clothing that matched the description of the clothing worn by the person who had been seen on the porch of the residence. (Id. at 190; 220; 232; 234-35). When first interviewed by the police appellant indicated that he had left the home of a friend shortly after 1:00 a.m.; however in a subsequent interview appellant stated he did not leave the home of his friend until after 2:00 a.m. (Id. at 236; 238; 242-43; 252). Appellant admitted that he had his dog with him on the day in question. (Id. at 245). Appellant's dog was identified by one of the eyewitnesses. (Id. at 206; 218-245).
 {¶ 34} Witnesses described the suspect as angry, intoxicated and yelling loud enough to wake the neighbors. (1T. at 185-86; 206; 210). The suspect also threatened that Mr. Boyd would regret not letting him into the house. (Id.).
 {¶ 35} Although appellant cross-examined the State's witnesses in an attempt to show the inconsistencies in the various statements and further in an attempt to demonstrate that the identification of him as the person who had started the fire was mistaken, the jury was free to accept or reject any and all of the evidence offered by the appellant and assess the witness' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v. Craig
(Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v.Nivens (May 28, 12996), Franklin App. No. 95APA09-1236. Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v.Antill (1964), 176 Ohio St. 61, 67, 197 N.E. 2d 548; State v.Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citingState v. Caldwell (1992), 79 Ohio App. 3d 667,607 N.E. 2d 1096. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. State v. Jenks (1991), 61 Ohio St. 3d 259,574 N.E. 2d 492.
 {¶ 36} We conclude the jury, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant was guilty of aggravated arson. Accordingly, appellant's convictions were not against the manifest weight of the evidence.
 {¶ 37} Appellant's sole assignment of error is overruled.
 {¶ 38} For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.
By Gwin, P.J., Hoffman, J., and Edwards, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed. Costs to appellant.