OPINION.
{¶ 1} The defendant-appellant, Jacob Heap, appeals from his conviction by the trial court of one count of aggravated rioting, in violation of R.C. 2917.02(A)(1), and one count of attempted arson, in violation of R.C. 2923.02(A). The charges resulted from Heap's involvement in a street drinking party that coincided with the Mexican holiday of Cinco de Mayo. He was sentenced to three years of community control and ordered to pay full restitution to the victims. In his appeal, Heap raises three assignments of error in which he challenges (1) the sufficiency of the evidence, (2) whether the indictment and judgment entry met the requirement of designating the degree of the offense, and (3) whether the trial court could have lawfully ordered him to pay full restitution to the victims.
 {¶ 2} For the following reasons, we affirm Heap's convictions but reverse a portion of the trial court's order of restitution.
 Facts {¶ 3} On May 3, 2003, Heap, a 19-year-old ex-Marine and University of Cincinnati student, participated in a Cinco de Mayo student drinking party along Stratford Avenue near the University of Cincinnati. This celebration had achieved a certain local notoriety and was also known as Cinco de Stratford. At one point in the evening's festivities, a group of revelers decided to upend two cars parked along the street. The cars were lifted up and flipped over on their backs. The cars belonged to two students, Joseph Binegar and Katherine Behrendt, who were not part of the crowd but were, rather, inside separate apartments along the street. Behrendt's car was a 1998 Plymouth Neon and Binegar's a 1989 Acura.
 {¶ 4} The police subsequently obtained videotapes taken by those in the crowd, and these were presented at trial, forming the state's primary case against Heap since none of the state's witnesses actually saw the destruction of the cars.
 {¶ 5} The videotapes initially showed a group of student revelers attempting to set fire to boxes in the middle of the street within fifteen to twenty feet of the parked Neon and Acura. Heap did not appear to be among the group setting the fire. After a small fire was finally started, a group of approximately twenty revelers was seen surrounding the Acura, reaching under it and rocking it, then lifting it up and flipping it over. The Acura was flipped toward the fire. When it came to rest, the upended Acura had formed an almost perfect forty-five-degree angle, with the rear end (and gas tank) suspended in the air above the fire.
 {¶ 6} Heap, who testified at trial and admitted to drinking all day and acting like a "dumb ass," appeared suddenly in the video, ripping his shirt off and strutting around the car. At one point he was seen jumping onto the exposed undercarriage of the car, posing triumphantly. At another point he could be seen going over to the car, appearing to pose for a picture (many in the crowd had video cameras and could be seen filming themselves or others) before taking his foot and stomping on the Acura's side windows. Other revelers could be seen congratulating him for his efforts.
 {¶ 7} Another reveler, wearing a floppy sombrero, was seen using a fire extinguisher to quickly douse the fire almost as soon as the Acura was flipped over. There was nothing in the videotapes to indicate that Heap was expecting or counting on others to extinguish the fire. Soon other revelers could be seen restarting the fire, but again someone with better sense entered the picture and scattered the flames with his foot.
 {¶ 8} A group of revelers then could be seen moving toward Behrendt's Neon, surrounding it and flipping it over. It is not clear from the videotapes if Heap was among this crowd. The front of the overturned Neon ended up resting near the front end of Acura, in other words away from the original fire. For a brief moment, a small burst of flame was visible inside or near the Neon, but the source or nature of the combustion was unclear. Many revelers were throwing debris at the car. Heap could not be seen in the videotapes at this juncture. The police were then seen arriving in riot gear and on horseback.
 {¶ 9} As noted, Heap was identified from the videotapes. When he was arrested, he did not admit to setting any fires that evening, but, according to the arresting officer, he did admit to helping to roll the two cars over. The police officer agreed on cross-examination that the videotapes did not show Heap actually starting any of the fires that night or assisting others in starting the fires. The officer conceded also that there was nothing on the videotapes that showed Heap trying to ignite any of the vehicles or throwing any objects at the vehicles.
 {¶ 10} In his testimony, Heap admitted to being extremely drunk and helping to push both cars over. He testified that soon afterward he left, and that he only realized later what he must have done. He denied setting any fires, helping to set any fires, or trying to set any cars on fire. Asked about the Acura being tossed so near a fire, he stated that he could not have believed that the car was close enough to ignite because otherwise he would never have jumped on top of it, exposing himself to injury. He conceded, however, that he was aware that the gasoline tank of a car was located in the rear of the vehicle. But he again insisted that if he actually believed that the Acura was close enough to the flames to ignite, he would never have gotten near it, let alone jumped on top of the exposed undercarriage.
 The Charges {¶ 11} Heap was charged with one count of aggravated rioting under R.C. 2917.01(A)(1), which makes it a felony for anyone to participate with four or more other people in a course of disorderly conduct "with purpose to commit or facilitate the commission of a felony." The indictment specified the felony that Heap and others were acting in concert to commit as aggravated arson under R.C. 2917.02(A)(1). The bill of particulars specifically asserted that Heap had helped throw both the Neon and the Acura into a fire started in the middle of the street and then "continued to try to set the automobiles on fire."
 {¶ 12} Attempted aggravated arson was charged in a separate count. That crime requires that a person knowingly create or cause physical damage to property by fire in an amount of $500 or more. R.C. 2917.02(A)(1). Although aggravated arson is normally a fourth-degree felony, an attempt reduces the charge to a fifth-degree felony under R.C. 2923.02(E).
 First Assignment of Error {¶ 13} In his first assignment of error, Heap asserts that the state failed to present competent evidence of two elements of attempted arson: (1) lack of consent by the owners of the vehicles, and (2) the monetary value of the two vehicles. The value of the vehicles was critical to the determination whether the arson was proved as a felony or a misdemeanor, since, as noted, the attempted physical harm had to total an amount of at least $500 to make the offense a fifth-degree felony. See R.C.2909.03(B)(2)(b) and 2923.02(E).
A. Consent
 {¶ 14} To commit an attempted aggravated arson under R.C.2909.03, one must either knowingly attempt to cause or knowingly attempt to create, by means of fire or explosion, "a substantial risk of physical harm to any property of another without theother person's consent." (Emphasis supplied.)
 {¶ 15} Both Binegar and Behrendt testified at trial. Behrendt testified that she was visiting her boyfriend who lived on Stratford and was watching a movie when others at the apartment told her that her 1998 Plymouth Neon had been flipped over. She testified that she went down to the street but was unable to inspect her car before it was towed away. The prosecution asked her directly whether she knew Heap and whether she had given him permission to touch or to damage her car. She replied "no" to both questions.
 {¶ 16} Binegar testified that he had driven his car, a 1989 Acura Legend, to a party on Stratford and parked it in the middle of the street. His testimony indicated that he was inside when his car was flipped over, and that he went outside to discover it upended and set on fire, with the windows smashed out. He was not asked directly whether he had given Heap or anyone else permission to damage his car.
 {¶ 17} Obviously, with respect to Behrendt, there was direct testimonial evidence that Heap did not have her consent to vandalize her car. As for Binegar, although he was not asked directly, we hold that his testimony was sufficient to support a reasonable inference that Heap had acted without his consent. There was certainly nothing in Binegar's testimony that would even remotely have indicated that he had any connection with Heap or any of the other revelers who had selected his car at random and flipped it onto or near a fire in the middle of the street. Indeed, it can be persuasively argued that the opposite conclusion, that Binegar had given his consent to the destruction of his car, would have been irrational, if not absurd.
B. Competency of Witnesses to Testify About Value
 {¶ 18} Heap argues that neither Binegar nor Behrendt was competent to testify as a non-expert about the value of their respective vehicles. As non-experts, he asserts, neither should have been permitted to testify about their cars' respective values under the so-called "owner-opinion" rule. That rule presumes that owners of property, though not experts, are sufficiently familiar with the property by having purchased or dealt with it to express an opinion about its worth. See, e.g.,Tokles Son, Inc. v. Midwestern Indemn. Co. (1992),65 Ohio St.3d 621, 626, 605 N.E.2d 936.
 {¶ 19} The basis for Heap's argument is technical: although there was nothing in the record to dispute that the two cars did not in every other respect belong to Behrendt and Binegar, both were not the titled owners of their cars. Behrendt testified that her Neon was a gift from her parents, who still held title to the vehicle, whereas Binegar testified that his parents were the titled owner of his Acura and that he had been making payments to them to eventually obtain title in his own name.
 {¶ 20} Initially, it should be observed that the owner-opinion rule does not magically confer expert status on the owner, but merely presumes that the owner is competent to testify about value as a non-expert based upon his or her familiarity with the property. Tokles Son, Inc. v. Midwestern Indemn. Co.
(1992), 65 Ohio St.3d 621, 605 N.E.2d 936. We have found very little authority in Ohio as to exactly what type of ownership the owner-opinion rule encompasses. As explained in Black's Law Dictionary, the term "owner" as used in the law is "a nomen genralissimum [and] * * * its meaning is to be gathered from the connection in which it is used * * *." Black's Law Dictionary (5Ed. 1979), 996. A legal owner is one "who is recognized and held responsible by the law as the owner of the property," while an equitable owner is one "who is recognized in equity as the owner of [the] property, because the real and beneficial use and title belong to him, although the bare legal title is vested in another." Id. at 996, 997. "There may therefore be two `owners' in respect of the same property, one the nominal or legal owner, the other the beneficial or equitable owner." Id. The essential attributes of ownership are the rights of "possession, enjoyment, and disposal" to the exclusion of others. Id. at 997.
 {¶ 21} If familiarity arising from ownership is the key to the owner-opinion rule, it strikes us that the distinction between legal and equitable ownership should not be determinative when applying the rule, especially where all the other incidents of equitable or beneficial ownership attach to the lay witness. It seems to us that the ultimate question is whether the nature of the person's ownership, be it legal or equitable or beneficial, is of sufficient character to presume a familiarity with the nature, quality, cost, and condition of the property that allows a credible opinion on value. We note, further, that the Ohio Supreme Court has held that the owner-opinion rule applies to the "owners" of leasehold estates, thus allowing lessees of real property to give testimony about the rental value of the leased premises. See Smith v. Padgett (1987),32 Ohio St.3d 344, 348, 513 N.E.2d 737. Lessees obviously do not hold legal title to the land.[1]
 {¶ 22} Furthermore, in Tokles, the court held that shareholders and directors of a closely held corporation may testify about the value of a corporate asset, even though the asset is legally titled in the corporation's name, if they have "acquired knowledge of the corporate property tantamount to thatof an owner by virtue of having purchased, or dealt with, theproperty as if he were the individual owner." Tokles, supra, at 627, 605 N.E.2d 936 (emphasis supplied).
 {¶ 23} Generally, the decision whether a witness is sufficiently acquainted with an object to give testimony about its value is within the discretion of the trial court. ClassicImports, Inc. v. Mitchell (Jan. 7, 1998), 9th Dist. No. 96CA0093, citing Wigmore, Evidence (Chadbourn Rev. 1970) Section 720. The credibility of that witness's opinion goes to its weight rather than its admissibility. Id. See, also, Tokles, supra, at 625, 605 N.E.2d 936.
 {¶ 24} We hold that it was not error for the trial court to have allowed Behrendt and Binegar to testify about the values of their respective cars under the owner-opinion rule, because even though they were not holders of legal title, they were clearly the equitable or beneficial owners of their vehicles, having all the other incidents of ownership necessary to confer upon them a presumed familiarity with the nature, quality, cost, and condition of the vehicles.
 {¶ 25} As for the testimony itself, Behrendt testified that her Neon was purchased in 1998 for $7,995, and that she had had it appraised in November 2002 as having a trade-in worth of $5,500. Binegar testified that his 1989 Acura was purchased for $2,000 less than a year before the incident, and that it was this amount he was in the process of paying to his family. Both Behrendt and Binegar testified that their cars were totally destroyed as a result of the damage inflicted upon them during the street party.[2] We hold that this testimony was sufficient to establish that the value of each car was in excess of $500 on May 3, 2003.
C. Evidence of Arson-Related Damages Amounting to $500 orMore
 {¶ 26} In order to prove attempted aggravated arson, it was not necessary that the state show that Heap had actually caused or created over $500 worth of fire or explosion damage to the vehicles, only that he had knowingly attempted to cause fire or explosion damage in that amount. We raise this point because the police officer who investigated the case and arrested Heap stated that he could not attach any monetary value to the damage to the cars caused by fire as opposed to damage caused by other destruction.
 {¶ 27} Further, is doubtful that anyone could have reasonably inferred an attempt by Heap to cause $500 of fire or explosion damage to the Neon, since the videotapes did not demonstrate that it was flipped over onto a fire, only that there was some small, momentary combustion inside the vehicle after it was flipped over, followed by a brief period of smoke. The source of the combustion could not be determined. Several people in the crowd (Heap not among them) could be seen throwing what appeared to be burning projectiles toward the Neon after it was overturned. But unless Heap was assumed to be acting in concert with everyone in the crowd, there was nothing in the videotapes, as conceded by the police officer who testified, that would have linked Heap to any effort to set the Neon on fire.
 {¶ 28} A review of the videotapes does show, however, that there was sufficient evidence upon which a person could have reasonably inferred that Heap had intended to cause $500 worth of fire or explosion damage to the Acura, since he was among several people who flipped the car almost directly onto an ongoing fire. But for the intervention of others to douse the flames, it appeared that the car might have ignited and the gas tank possibly exploded. It bears emphasis that Heap and the others could have flipped the Acura away from the fire, but instead chose to flip the car toward the flames. It should also be pointed out again that there was nothing in the videotapes or the testimony to suggest that Heap was acting in concert with those who attempted to put out the fire when they perceived a risk of the car igniting.
 {¶ 29} Heap testified at the trial that he never once believed that the Acura was at risk of catching fire or exploding. In his view, the Acura was never close enough to the flames to actually ignite. As proof of this, he pointed to the fact that after the Acura was upended, he could be seen in the videotapes jumping on top of the car. As noted, he testified that he would never have done so if he had actually thought that the car was at risk of catching fire or exploding. As the finder of fact, the trial court was free to reject all or part of his testimony. Furthermore, a person is presumed to intend the natural consequences of his acts, and certainly one of the natural consequences of flipping a gasoline-laden car onto or near a fire is that it might catch fire and even explode, thereby sustaining damage equal to or in excess of $500. As we view the videotapes, the fire was at one point close enough and strong enough to threaten the gas tank. In sum, although there was certainly not one inevitable conclusion to be drawn from the videotapes, we hold that they offered sufficient evidence upon which the trial court could have reasonably inferred that Heap, by helping to toss the Acura so close to an open fire, was attempting to cause or create physical damage to the Acura by fire or explosion. Furthermore, since there was a risk of considerable fire or explosion if the flames caught, we hold that there was sufficient evidence that this damage would have equaled or exceeded $500.[3]
 {¶ 30} Finally, we note that since Heap was convicted of only one count of aggravated arson (i.e., not two separate counts for both the Neon and the Acura), it is sufficient for the purpose of upholding his conviction that there be only evidence of attempted aggravated arson with respect to the Acura.
 II. Second Assignment of Error A. Sufficiency of the Indictment
 {¶ 31} Heap argues in his second assignment of error that the language in the second count of the indictment was deficient in that it (1) did not disclose the degree of the offense charged, and (2) did not set forth the additional element that the property damaged was valued at $500 or more. Again we disagree.
 {¶ 32} R.C. 2945.75 provides, "(A) When the presence of one or more additional elements makes an offense one of more serious degree: (1) The affidavit, complaint, indictment, or information either shall state the degree of the offense which the accused is alleged to have committed, or shall allege such additional element or elements. Otherwise, such affidavit, complaint, indictment, or information is effective to charge only the least degree of the offense." (Emphasis supplied.)
 {¶ 33} The indictment in the instant case stated that Heap was being charged with "Attempt (ARSON) 2923.02(A)[F5]". As counsel for Heap conceded during oral argument, "F5" clearly denoted that the second count was a fifth-degree felony, and thus we hold that the indictment satisfied R.C. 2945.75(A)(1). Since the indictment stated the degree of the offense, it need not have alleged any additional elements.
B. Sufficiency of Judgment Entry
 {¶ 34} Heap raises similar arguments with respect to the sufficiency of the judgment entry. R.C. 2945.75(A)(2) provides, "A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged."
 {¶ 35} Announcing its decision, the trial court stated, "On Count 2, attempted arson, a violation of 2923.02(A) of the Ohio Revised Code, I find the defendant guilty. I specifically find that the value of the property was five hundred dollars or more in this case." Although the specific finding on value was not contained in the court's subsequent journal entries, those entries continued to designate the offense as a felony of the fifth degree, thus satisfying R.C. 2945.75(A)(2), which is expressly phrased in the disjunctive.
 III. Third Assignment of Error {¶ 36} In his third assignment of error, Heap argues that the trial court erred by denying his request for a hearing on the issue of restitution. As noted, the trial court ordered that Heap pay restitution in the amount of $8,636, representing the cumulative value of the vehicles belonging to Behrendt and Binegar. Heap's attorney objected to the amount, arguing that it was unfair for Heap to be held individually liable for all the damage done to both cars, particularly where there were other cases involving other defendants who had allegedly contributed to the vehicles' destruction. In denying the motion for a hearing, the trial court appeared to hold open the possibility that a hearing might be allowed if Heap were unable to make restitution himself.
 {¶ 37} R.C. 2929.18(A) provides that a trial court may sentence a person convicted of a felony to any financial sanction or to any combination of financial sanctions authorized by law. Restitution is specifically authorized under R.C. 2929.18(A)(1), which states that the sentencing court may order "restitution by the offender to the victim of the offender's crime * * * in the amount based on the victim's economic loss."
 {¶ 38} In ordering restitution, the trial court must limit its award to "the actual economic loss caused by the crime forwhich the offender was convicted." State v. Littlefield (Feb. 6, 2003), 4th Dist. No. 02CA19 (emphasis supplied), citing Statev. Hafer, 144 Ohio App.3d 345, 348, 2001-Ohio-2412,760 N.E.2d 56; see, also, State v. Hooks (2000), 135 Ohio App.3d 746, 748,735 N.E.2d 523. As noted by the court in Littlefield, the corollary of this principle is that an "offender cannot be ordered to pay restitution for damage arising from a crime of which he is not convicted." Littlefield, supra.
 {¶ 39} In Littlefield, the court of appeals reversed a trial court's order requiring the defendant to pay restitution for damage to the steering column and gearshift of a car caused when the vehicle was hot-wired and stolen, since the defendant had been convicted only of being in receipt of the stolen vehicle. The Littlefield court rejected the prosecution's argument that the defendant should nevertheless have been made to pay for the damage since both offenses were theft offenses and were interrelated (the defendant's fingerprints were found on the steering column near the damage). Similarly, in State v.Sutherland (Aug. 15, 1997), 2d Dist. No. 97CA25, the defendant had broken into and set ablaze a community sports center and a church, but was only charged with arson for the sports-center fire. After his conviction, the trial court ordered that he pay full restitution for both fires, but the appellate court reversed that part of the order requiring him to pay for the church fire upon the basis that could not be ordered to pay restitution for a fire that he had not been convicted of starting.
 {¶ 40} Heap was convicted of aggravated rioting as a result of his acting with others to attempt an aggravated arson. While we have held the evidence sufficient to support this charge with respect to Heap's flipping over Binegar's Acura, as noted we cannot discern any evidence, after repeated viewings of the videotapes, that Heap, acting individually or in concert with others, attempted to set Behrendt's Neon on fire by flipping it over. The small burst of flame that appeared very briefly inside the vehicle after it was flipped over did not appear significant, and in any case it could not be directly traced to Heap given all the other crowd activity. The incidents involving each car were sequential but separate and distinct. It strikes us that Heap's actions in helping to flip over the Neon should have been the basis of a separate lesser charge such as simple rioting or criminal damaging, but it cannot be said to be part of the crime, aggravated rioting by virtue of an attempted arson, upon which the trial court properly convicted him.
 {¶ 41} We hold, therefore, that the trial court was without authority to order Heap to pay restitution for Behrendt's Neon since it was not damaged as a result of the crime for which he was convicted.
 {¶ 42} We reject, however, Heap's argument that the trial court was required to attempt to prospectively apportion damages among others who had yet to be convicted of charges arising from the incident. Although a victim is entitled to only one recovery, we have found no cases that would have required the court to await further developments in pending cases. We note, in this regard, the court's stated willingness to revisit the issue at a future hearing if necessary.
 {¶ 43} Accordingly, we overrule Heap's first and second assignments of error. With respect to his third assignment of error, we find merit in it only with respect to the trial court's order requiring him to pay restitution for the value of Behrendt's Neon, and we therefore reverse that part of the order. In all other respects, the judgment of the trial court is affirmed.
Judgment affirmed in part and reversed in part.
Winkler, P.J., and Hildebrandt, J., concur.
[1] Ohio courts regard a leasehold estate as a hybrid form of property called a "chattel real." See, e.g., Abraham v.Fioramonte (1952), 158 Ohio St. 213, 107 N.E.2d 321.
[2] This testimony was apparently hearsay but not the subject of any objection.
[3] It should be pointed out that Heap's assignment of error only challenges the sufficiency of the evidence and does ask us to address whether his conviction was contrary to the manifest weight of the evidence.