[Cite as *State v. Bates*, 2013-Ohio-3565.]

STATE OF OHIO    )     IN THE COURT OF APPEALS
            )ss:    NINTH JUDICIAL DISTRICT
COUNTY OF MEDINA   )

STATE OF OHIO         C.A. No.   12CA0046-M

  Appellee

  v.             APPEAL FROM JUDGMENT
                ENTERED IN THE
MARC A. BATES       COURT OF COMMON PLEAS
                COUNTY OF MEDINA, OHIO
  Appellant        CASE No.  11CR0575

DECISION AND JOURNAL ENTRY

Dated: August 19, 2013

MOORE, Presiding Judge.

{¶1} Defendant, Marc A. Bates, appeals from his conviction in the Medina County Court of Common Pleas. We affirm in part, reverse in part, and remand this matter for further proceedings.

I.

{¶2} On the morning of September 12, 2011, the Medina County home of William Harmath and his son, John Harmath, was burglarized. The intruder stole several jars of coins, William Harmath's wedding rings, and John Harmath's blue Ford Ranger pickup truck. Later that morning, the Harmath's neighbors, John Tesar and Constance Hammon, reported to police that someone had broken the lock to their barn and had taken bicycles and an oxygen tank. The bicycles and tank were recovered from a field across the street from the Harmaths' residence. Four days later, law enforcement responded to a call of a vehicle on fire in Wayne County a short distance from the Medina County line. The vehicle was badly burned, but appeared to be a

pickup truck. On the same morning, a Wayne County resident, who lived less than a mile from where the truck was burned, reported to police that her red Dodge Ram pickup truck was missing from her barn. After consultation between officers in Wayne and Medina Counties, law enforcement determined that the burned truck was Mr. Harmath's stolen Ford Ranger.

{¶3} Officers suspected that Meghan Mora and Mr. Bates, who were friends of Ms. Hammon's son, were involved in these incidents. On September 16, 2011, police officers located Ms. Mora and Mr. Bates in the stolen Dodge Ram and placed them under arrest. In an interview following his arrest, Mr. Bates acknowledged having taken the two trucks.

{¶4} The Medina County Grand Jury indicted Mr. Bates on the following charges stemming from these incidents: burglary in violation of R.C. 2911.12(A)(1), with an attendant repeat violent offender specification, theft of a motor vehicle in violation of R.C. 2913.02(A)(1), breaking and entering in violation of R.C. 2911.13(A), breaking and entering in violation of R.C. 2911.13(B), and arson in violation of R.C. 2909.03(A)(1). Mr. Bates pleaded not guilty to the charges, and the case proceeded to jury trial on the charges and a bench trial on the repeat violent offender specification. The jury was instructed on complicity in regard to the burglary and arson charges. The jury found Mr. Bates guilty on all counts, and the trial court later determined that Mr. Bates was a repeat violent offender.

{¶5} In a sentencing entry issued on May 18, 2012, the trial court sentenced Mr. Bates to a total term of incarceration of twelve years. Mr. Bates timely appealed from the sentencing entry, and he now presents two assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUPPORT THE JURY'S GUILTY VERDICTS AGAINST [MR. BATES] AS TO THE CHARGED BURGLARY AND ARSON OFFENSES, AND [HIS] CONVICTIONS FOR BURGLARY AND ARSON WERE EACH AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} In his first assignment of error, Mr. Bates contends that his convictions for burglary and arson were based upon insufficient evidence and were against the manifest weight of the evidence.

Sufficiency of the Evidence

{¶7} The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When considering a challenge to the sufficiency of the evidence, the court must determine whether the prosecution has met its burden of production. *Id.* at 390 (Cook, J. concurring). In making this determination, an appellate court must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶8} Mr. Bates has limited his sufficiency of the evidence challenge to his convictions for burglary and arson. We likewise will limit our discussion.

{¶9} The offense of burglary is defined in R.C. 2911.12(A), which provides in relevant part:

No person, by force, stealth, or deception, shall do any of the following:

(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense[.]

{¶10} The offense of arson is defined in R.C. 2909.03(A), which provides in relevant part:

No person, by means of fire or explosion, shall knowingly do any of the following:

(1) Cause, or create a substantial risk of, physical harm to any property of another without the other person's consent[.]

{¶11} Here, the trial court instructed the jury on aiding and abetting pursuant to Ohio's complicity statute, which provides in relevant part that "[n]o person acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C. 2923.03(A). In order to support a conviction based upon a defendant's complicity through "aiding and abetting:"

[T]he evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). Therefore, to be complicit through aiding and abetting, the accused must have taken some role in causing the commission of the offense. "[T]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269 (1982).

{¶12} Here, as part of the State's case-in-chief, it produced the testimony of the Harmaths, Mr. Tesar, Ms. Hammon and police officers, who recounted events spanning from September 12, 2011 through September 16, 2011.

{¶13} John Harmath and his father, William Harmath, testified that, on September 12, 2011, they resided on Columbia Avenue in Medina County. On that morning, William Harmath woke up and prepared for work, leaving his house at approximately 6:30 a.m. Thereafter, John Harmath, who was sleeping when his father left, woke up briefly upon hearing some noises in the home, but he believed that the noises were made by his father preparing to leave for work. A short time later, his bedroom door opened, and he saw the figure of a "stocky" male, between 5'6" and 5'10" tall, wearing a hooded, sleeveless, gray sweatshirt, standing in the doorway. He could not see the man's face, as the hood was up and there was little light. Upon seeing John Harmath, the man shut the door. John Harmath realized that the man was not his father, and he opened his bedroom door, and looked in his father's bedroom, where he saw that the dresser drawers were torn out of the dresser. He ran out of the house and down his driveway, where he saw his blue Ford Ranger pickup truck being driven quickly down the street, at which point he called 9-1-1 and then his father. Police officers arrived, followed by William Harmath. After William Harmath arrived, he walked through the house and noticed that numerous jars of coins located in his bathroom had been taken. Also, a large crock of pennies was missing from his bedroom, and his wedding rings were missing from his dresser. William Harmath estimated that the intruder stole approximately $1500 in change from his home.

{¶14} William Harmath suspected that his neighbor's son, Russell Hammon, might have been involved in the break-in, and he relayed his suspicion to officers. William Harmath also informed the officers that he had met two of Mr. Hammon's friends, Ms. Mora and Mr. Bates,

approximately a week prior to this incident. At that time, Ms. Mora and Mr. Bates approached William Harmath while he was working in his garage. They introduced themselves as a married couple, and told him that Mr. Bates had lost his wedding ring at a nearby campsite. They asked Mr. Harmath to give them a ride to go look for it. Mr. Harmath agreed. When they got to the campsite, as soon as Mr. Harmath turned his back, Mr. Bates claimed to have found the ring, and he seemed overjoyed, hugging Ms. Mora. Ms. Mora displayed no reaction to finding the ring. Mr. Harmath's suspicions were aroused because he believed that Mr. Bates' very sudden discovery of the ring and Ms. Mora's lack of emotion to be unusual. Mr. Harmath informed police officers of his suspicions.

{¶15} Officer Michael Snider of the Medina County Sheriff's Office responded to the break-in at the Harmath residence. When he arrived at the scene, he noticed that, because of a heavy dew that morning, more than one set of tracks was visible in the grass adjacent to the Harmaths' home. The tracks appeared to extend in lines from the Harmaths' property to a field across the street, and looked to have been made by more than one person walking in the grass. Across the street, the officer located two bicycles and an oxygen tank. The officer also discovered two fresh shoe prints of different lengths, one in William Harmath's bedroom and one in the grass. Officer Snider photographed the scene, and these pictures were submitted into evidence. The pictures appear to display two sets of tracks in the grass.

{¶16} John Tesar and Constance Hammon testified that they live next door to the Harmaths. On the morning at issue, a police officer came to the home and inquired of Ms. Hammon as to the whereabouts of her son. She informed the officer that her son was incarcerated, and she asked the officer why he was looking for him. The officer informed Ms. Hammon of the break-in at the Harmath residence. Ms. Hammon requested Mr. Tesar to check

the barn to make sure that nothing had been taken from the property. When Mr. Tesar went to the barn, he could see that a locking mechanism had been pried off of one of the doors. Inside the barn, he saw that several items were missing, including two bikes and an oxygen tank. Officers confirmed with Mr. Tesar and Ms. Hammon that the bicycles and oxygen tank located in the field across the street from the Harmaths' residence were those that were taken from the Hammon barn.

{¶17} Detective Kevin Ross of the Medina County Sheriff's Office testified that he was assigned to investigate these break-ins. Because of Mr. Harmath's suspicions, police officers focused their investigation on Ms. Mora and Mr. Bates. Detective Ross testified that he knows Ms. Mora and Mr. Bates from his work with the police department. Over the next few days, Detective Ross investigated leads as to the whereabouts of Ms. Mora and Mr. Bates. Ultimately, officers located the two driving a stolen red Dodge Ram after Ms. Mora left a meeting with her probation officer in Lorain County on September 16, 2011. Local officers apprehended Mr. Bates and Ms. Mora and transported them to the Lorain County Sheriff's office, where officers from Wayne, Lorain, and Medina Counties interviewed them.

{¶18} A video tape of the interview of Mr. Bates was submitted into evidence. During the interview, Mr. Bates acknowledged that he and Ms. Mora, along with another individual named Jason Cantrell, had been camping in a field across from the Hammon residence. They believed that they needed to leave the area, and Mr. Bates took a Ford Ranger from a residence across the street. Mr. Bates maintained that he never entered the residence, but Mr. Cantrell did go in the garage. After they left in the Ford Ranger, they went to a Giant Eagle in Strongsville, Ohio, to use a coin machine to cash in change that Mr. Cantrell had taken from the Harmaths' property. The State submitted into evidence security footage from the Strongsville Giant Eagle

which was recorded on the morning of September 12, 2011. On the footage, Detective Ross identified Mr. Bates and Mr. Cantrell as they entered the store at about 7:30 a.m. On the video, Mr. Bates is wearing what appears to be a two-toned shirt. The portion of the shirt covering his torso is dark, and sleeves are light. He appears to be carrying a duffel bag, and he is wearing something on his head. Mr. Cantrell appears to be wearing a hooded camouflage vest over a print shirt. After they enter the store, security cameras do not reveal the men until they conduct a transaction at a customer service counter. Detective Ross testified that the coin machine in this Giant Eagle is not located within view of the security cameras.

{¶19} Further, during Mr. Bates' interview, he told officers that after leaving the Giant Eagle, they drove Mr. Cantrell to Cleveland. A few days later, Ms. Mora needed to meet with her probation officer in Lorain County. Mr. Bates picked up Ms. Mora in the Ford Ranger, and he was accompanied by another individual named Shane McClemore. However, the Ford Ranger ran out of gas on the road. They left it parked off of the road in a driveway. A short distance away, Mr. Bates and Mr. McLemore located a red Dodge Ram, which they stole.

{¶20} Officers from the Wayne County Sheriff's office testified as to the theft of the Dodge Ram. Officer Alex Abel received a call on September 16, 2011, of breaking and entering of an outbuilding in Wayne County, five miles from the Medina County line. Officer Abel entered the VIN of the red pick-up truck into his system. Later that day, the officer received a call stating that officers had located the truck in Lorain County with two suspects. The officers who had apprehended the suspects inquired of Officer Abel as to whether Wayne County officers had located Mr. Harmath's blue Ford Ranger. After consulting with dispatch, Officer Abel learned that a vehicle fire had been reported early that morning a short distance from where the Dodge Ram had been stolen.

{¶21} Officer Joseph Copenhaver testified that he responded to the call of the vehicle on fire in Wayne County at approximately 3:40 a.m. on September 16, 2011. The vehicle was badly burned, but appeared to be a pick-up truck. After searching the vehicle, he found the VIN plate, which had been partially melted. He could identify only the last six numbers of the VIN. The officer believed that, based upon the damage to the truck, the fire had started at the rear of the truck, making it unlikely that the fire resulted from mechanical issues. Later that day, after consulting with law enforcement in Medina, Lorain and Wayne Counties, he discovered that the recoverable VIN digits from the burned vehicle matched the VIN of John Harmath's Ford Ranger.

{¶22} On appeal, Mr. Bates first argues that the evidence was insufficient to establish that he trespassed inside the Harmath residence to support his conviction for burglary. In support, Mr. Bates cites to John Harmath's testimony, wherein he gave a description of the intruder's build, but could not identify the intruder because he could not see the man's face. Mr. Bates also cites to the interview of him by the officers, where he maintained that Mr. Cantrell entered the Harmath residence.

{¶23} However, John Harmath testified that the intruder was 5'6" to 5'10" tall, and "stocky." Detective Ross testified that Mr. Bates is 5'7" tall and 200 pounds; whereas Mr. Cantrell is 6'0" tall and 175 pounds. Officer Snider testified that there were more than one set of "tracks" which appeared to be made by more than one individual walking through the wet grass, extending from the home to the field across the street. Further, William Harmath testified that the "crock" of pennies in his bedroom was large and very heavy. He would not think that one person could lift and remove the crock on his own. This evidence suggests that Mr. Bates entered the Harmath home with Mr. Cantrell. Moreover, Detective Ross identified Mr. Bates on

the video from Giant Eagle, where Mr. Bates had told officers that he and Mr. Cantrell had cashed in the coins. The security footage is consistent with Mr. Bates' statement. Based upon the record, there was sufficient evidence from which a reasonable jury could determine that Mr. Bates entered the Harmath residence.

{¶24} Further, the jury was instructed on complicity. Based upon the above evidence, the jury could reasonably have concluded that Mr. Bates supported or assisted Mr. Cantrell in entering the home, and, based upon his actions prior to and after the break-in, that he shared the criminal intent of the Mr. Cantrell. Accordingly, sufficient evidence supported Mr. Bates' conviction for burglary.

{¶25} In regard to his conviction for arson, Mr. Bates argues that (1) there existed no evidence that he started the truck fire, (2) venue for the arson charge was not proper in Medina County, and (3) the evidence was insufficient to establish the value of the truck.

{¶26} In regard to Mr. Bates' involvement in the fire, Mr. Bates acknowledged that he left the Ford Ranger in a driveway when he ran out of gas. Officer Copenhaver testified that, by the time he arrived at the scene of the truck on fire at 3:40 a.m., the truck had been severely burned from rear to front and no one was present at the scene to claim ownership of the truck. Based upon his experience with car fires, Officer Copenhaver testified that there was no indication that the fire was caused by mechanical problems, which would tend to ignite at the front of a vehicle. Therefore, he believed the fire was intentionally set.

{¶27} We recognize that there existed no direct evidence of Mr. Bates, as the principal or as an aider and abettor, igniting the Ford Ranger. However, "[o]f necessity, proof of arson must often rely heavily on circumstantial evidence because of the nature of the crime. But, as in all crimes, circumstantial evidence may establish any given element of the offense. Motive and

opportunity are facts which can weigh heavily in establishing arson." *State v. Hoak*, 9th Dist. Lorain No. 94CA005917, 1995 WL 471383, *10 (Aug. 9, 1995), quoting *State v. Shaver,* 9th Dist. Lorain No. 89CA004505, 1989 WL 154782, *3 (Dec. 20, 1989), quoting *State v. Pruiett*, 9th Dist. Summit No. 12858, 1987 WL 9839, *1 (Apr. 15, 1987). *See also State v. Pahlau*, 5th Dist. Stark No. 2006-CA-00010, 2006-Ohio-4051, ¶ 12-13, 33-36 (sufficient evidence produced to support conviction for aggravated arson where house fire appeared to have been purposefully set, and appellant was seen in the area of house just prior to fire, screaming outside that homeowner would "regret not letting him into the house"). "[W]hether considering circumstantial or direct evidence, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous evidence inference. In both instances, the jury must use its experience with people and events in weighing the probabilities." (Internal quotations omitted.) *State v. Newton*, 11th Dist. Lake No. 2009-L-137, 2010-Ohio-6438, ¶ 75.

**{¶28}** Our review of the evidence indicates that the State produced sufficient evidence, which, when viewed in the light most favorable to the State, would convince the average juror that Mr. Bates either set fire, or was complicit with Mr. McLemore in setting fire, to the Ford Ranger. The jury could infer, based upon Mr. Bates' and Mr. McLemore's motive, their presence at the truck, and their opportunity to start the fire, together with the officer's testimony that the fire was likely intentional, that Mr. Bates was, at minimum, complicit in the offense.

**{¶29}** Next, in regard to Mr. Bates' argument pertaining to venue, he maintains that venue for the arson charge was improper in Medina County because the truck was burned in Wayne County. "Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant. The

standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." (Internal citation omitted.)  *State v. Headley*, 6 Ohio St.3d 475, 477 (1983).  The State maintains that Mr. Bates could be convicted in Medina County for the arson because he engaged in a continuous course of criminal conduct.

{¶30}  R.C. 2901.12(H) provides, in part, as follows:

When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred.  Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1) The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

* * *

"R.C. 2901.12(H) provides a sensible, efficient approach to justice by permitting one court to hear a matter which has roots in several court jurisdictions."  *State v. Brown*, 9th Dist. Summit No. 25287, 2011-Ohio-1041, ¶ 39, quoting *State v. Lydicowens*, 9th Dist. Summit No. 14054, 1989 WL 140617, *6 (Nov. 22, 1989).

{¶31}  Mr. Bates argues that venue for the arson charge was improper in Medina County because the arson occurred in Wayne County.  However, Mr. Bates has not referenced or accounted for R.C. 2901.12(H), on which the State based prosecution of the arson in Medina County.  "As this Court has repeatedly held, '[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out.'"  *Brown* at ¶ 40, quoting *Cardone*

*v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). "Because [Mr. Bates] has not set forth any argument that the State failed to prove a continuous course of criminal conduct pursuant to R.C. 2901.12(H), this Court will not create such an argument on his behalf." *See Brown* at ¶ 40.

{¶32} Lastly, in regard to Mr. Bates' argument relative to the value of the Ford Ranger, he maintains that the State failed to produce sufficient evidence to support elevation of the offense from a first degree misdemeanor to a fourth degree felony.

{¶33} R.C. 2909.03(B)(2)(a) provides that a violation of R.C. 2909.03(A)(1) is a misdemeanor of the first degree, except as otherwise provided in R.C. 2909.03(B)(2)(b). R.C. 2909.03(B)(2)(b), in turn, provides that a violation of R.C. 2909.03(A)(1) is a felony of the fourth degree "[i]f the value of the property or the amount of the physical harm involved is one thousand dollars or more[.]" Here, the jury returned a finding that the value of the property subject to the arson was one thousand dollars or more. We agree with Mr. Bates that this finding was not supported by sufficient evidence.[1]

{¶34} "When a person is charged with a violation of division (A)(1) of section 2903.03 of the Revised Code involving property value or an amount of physical harm of one thousand dollars or more * * * the jury or court trying the accused shall determine the value of the property or amount of physical harm and, if a guilty verdict is returned, shall return the finding as part of the verdict." R.C. 2909.11(A). The finding and return of the value or amount of

---

[1] The version of R.C. 2909.03(B)(2)(b) in effect on September 16, 2011, the date of the offense, provided a $500 threshold to elevate the degree of the offense to a fourth degree felony. *See* 2011 Ohio Laws File 29 (Am. Sub. H.B. 86). As we conclude that there lacked sufficient evidence of value to establish that the property was worth either $500 or $1000, we merely note the change in the law. *See State v. Taylor*, 9th Dist. No. 26279, 2012-Ohio-5403, *cert. allowed* 134 Ohio St.3d 1466, 2013-Ohio-553.

physical harm need not specify an exact value or amount, and is sufficient if it includes a statement that the value or amount was one thousand dollars or more. R.C. 2909.11(A)(1).

**{¶35}** To determine the value of property, this Court has recognized that:

R.C. 2909.11(B)(2)-(3) prescribes three different methods for computing "the value of the property or the amount of the physical harm involved" for the purpose of determining whether the [one thousand] dollar threshold at R.C. 2909.03(B)(2)(b) has been met. Where property can be "restored substantially to its former condition," then the amount of physical harm is the reasonable cost of restoration. R.C. 2909.11(B)(2). *If, however, the physical harm done to the property is such that restoration is impossible, then the value of the property is its replacement cost for personalty*, and "the difference in the fair market value of the property immediately before and immediately after the offense" for realty. R.C. 2909.11(B)(3).

(Emphasis added.) *State v. Beeghley*, 9th Dist. Wayne No. 02CA0023, 2003-Ohio-1287, ¶ 28.

**{¶36}** At trial, John Harmath testified that the Ford Ranger was a year 2000 model. When he viewed the truck after the fire, he concluded that the truck suffered irreparable harm, and his father testified that they let the impound company keep what was left of the burned frame and body. Neither of the Harmaths, nor any other witness, testified as to the value of, or the cost to replace, the Ford Ranger and/or its contents. *See* R.C. 2909.11(B); *see also State v. Heap*, 1st Dist. Hamilton No. C-040007, 2004-Ohio-5850, ¶ 25 (sufficient evidence existed as to value of destroyed vehicles where the owners testified as to year of purchase and purchase price of vehicles). The State maintains that the jurors could determine the value of the truck using their "common knowledge, reason, and experience[.]" However, the only evidence presented as to the truck was its year, make, and model. Although the Harmaths characterized the truck after the fire as "completely destroyed," the jury had insufficient evidence before it from which it could determine the truck's value prior to the fire.

**{¶37}** Accordingly, we agree with Mr. Bates to the extent that he argues in his first assignment of error that he was improperly convicted of felony arson.

Manifest Weight of the Evidence

{¶38} When a defendant asserts that his or her conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). In making this determination, this Court is mindful that "[e]valuating the evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982) and *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 154 (12th Dist.1987).

{¶39} Here, the defense provided the testimony of Ms. Mora. She maintained that, on the morning of September 12, 2011, Mr. Cantrell's mother had given her, Mr. Bates, and Mr. Cantrell a ride to the property across the street from the Harmath residence. However, Ms. Mora was fearful of her husband, Donald Mora, and she believed that Mr. Cantrell had told Mr. Mora where they were located. Mr. Bates and Mr. Cantrell left the property, and later returned with the Ford Ranger. When they arrived, Mr. Bates was upset and asked Mr. Cantrell "Why the F did you go in the house? That's not what we were doing. That's not what was supposed to be done." They then drove to Giant Eagle and cashed in about $70 in change, and Ms. Mora purchased donuts. After driving Mr. Cantrell to Cleveland and dropping him off, she and Mr. Bates went to Akron, where Ms. Mora stayed with a woman that she knew. A few days later, Mr. Bates picked her up in the Ford Ranger, and another individual named Shane McLemore was with him. The Ranger ran out of gas, and Ms. Mora waited in the truck while Mr. Bates and

Mr. McLemore went to get gas. However, Mr. Bates and Mr. McLemore returned in a different truck instead. She later learned that the Ford Ranger had been burned, but she maintained that she did not know who started the fire.

{¶40} On cross-examination, Ms. Mora acknowledged that, when Mr. Bates and Mr. McClemore returned with the Dodge Ram, they did not pull into the driveway where the Ford Ranger was parked. Instead, they honked the horn to get her attention as they drove by, and they parked the Dodge Ram a short distance down the road. Ms. Mora grabbed her possessions from the Ford Ranger and walked to the Dodge Ram. The men then got out of the Dodge Ram to retrieve their possessions from the Ford Ranger. Ms. Mora could not see what Mr. Bates and Mr. McClemore were doing when they returned to the Ford Ranger, and she did not have knowledge of whether either of them began the fire.

{¶41} Based upon Ms. Mora's testimony, Mr. Bates argues that his conviction for burglary was against the manifest weight of the evidence. In support, Mr. Bates points to Ms. Mora's testimony regarding Mr. Bates' excited utterance to Mr. Cantrell regarding entering the Harmath residence. Mr. Bates argues that this establishes that he did not enter the Harmath residence, nor did he share Mr. Cantrell's criminal intent in entering the home. However, as set forth in our discussion of the sufficiency of the evidence above, circumstantial evidence supported that Mr. Bates was at least complicit in the burglary. Mr. Bates and Mr. Cantrell both went to the property. Mr. Bates acknowledged that he was aware that Mr. Cantrell took change from the property, and Mr. Bates gave him a ride afterward in the Ford Ranger which he had stolen from the property. Mr. Bates then drove them to Giant Eagle to cash in the change which Mr. Cantrell had just taken. The Giant Eagle security footage shows Mr. Bates and Mr. Cantrell

walking into the store together, and shows them together at a customer service counter, approximately 20 minutes after the burglary was reported.

{¶42} Based upon the evidence of Mr. Bates' behavior before and after the burglary, we cannot say that the jury clearly lost its way in convicting Mr. Bates of burglary. Therefore, we conclude that this is not the exceptional case where the jury created a manifest miscarriage of justice in finding Mr. Bates guilty of this charge.

{¶43} In regard to Mr. Bates' arson conviction, although he states in his assignment of error that this conviction was against the weight of the evidence, we cannot discern in his brief a corresponding argument on this point. Accordingly, we decline to review the weight of the evidence in regard to the arson conviction.

{¶44} Therefore, Mr. Bates' first assignment of error is overruled except to the extent that he argues that there was insufficient evidence to determine the value of the Ford Ranger. To that extent only, Mr. Bates' first assignment of error is sustained.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED TO THE PREJUDICE OF [MR. BATES] BY FAILING OR REFUSING TO GIVE AN OSBA JURY INSTRUCTION REQUESTED BY THE DEFENSE ON COMPLICITY, SPECIFICALLY THE PORTIONS OF THE INSTRUCTION ON "MERE PRESENCE" AND "ACTIVE PARTICIPATION[,"] WHERE THE EVIDENCE PRESENTED WARRANTED THAT JURY INSTRUCTION AND WHERE THE FAILURE TO GIVE THAT ENTIRE INSTRUCTION RESULTED IN THE JURY'S GUILTY VERDICTS AS TO THE BURGLARY AND ARSON COUNTS OF THE INDICTMENT.

{¶45} In his second assignment of error, Mr. Bates argues that the trial court erred to his prejudice in failing to instruct the jury that defendant's "mere presence" at the scene of a crime cannot support a conviction. We disagree.

{¶46} "A defendant is entitled to have his instructions included in the charge to the jury only when they are a correct statement of the law, pertinent and not included in substance in the general charge." *State v. Frazier*, 9th Dist. Summit No. 25338, 2011-Ohio-3189, ¶ 17, quoting *State v. Theuring*, 46 Ohio App.3d 152, 154 (1st Dist.1988). "This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68, citing *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45.

{¶47} Here, the State and defense submitted proposed jury instructions to the trial court. The trial court chose to utilize the State's proposed instructions. In its instructions, the trial court charged the jury with determining whether Mr. Bates knowingly aided or abetted another in committing burglary and arson. The court further instructed the jury:

> Aid means to help, assist or strengthen.
>
> Abet means to encourage, counsel, incite or assist.
>
> A person who knowingly aids, helps, assists or associates himself with another in the commission of a crime is regarded as if he were the principal offender and is just as guilty as if he personally performed every act constituting the offense.
>
> When two or more persons have a common purpose to commit a crime and one does one part and the second performs another, those acting together are equally guilty of the crime.
>
> Where two or more persons have a common purpose to commit a crime and where in continuous sequence of events other crimes are committed, all of said persons are responsible for all of the crimes which happened in a continuous sequence of events, even if all said persons were not physically present when the other crime was committed.

{¶48} Mr. Bates objected to the instructions. Specifically, Mr. Bates argued that the above instruction on aiding and abetting is an incomplete statement of the law, because it does not provide an instruction that Mr. Bates' mere presence at the scene would not be sufficient to

constitute aiding or abetting, and that he, instead, must have actively participated in the commission of the crimes.

{¶49} We conclude that the trial court's instruction above clearly indicated that, in order to convict Mr. Bates based upon aiding and abetting, the jury was required to determine that he knowingly and actively participated in the offenses of burglary and arson. "Therefore, even were we to assume that the evidence presented at trial was consistent with the requested charge, we would find no error in the court's refusal to instruct the jury on 'mere presence,'" or on active participation. *State v. Johnson,* 140 Ohio App.3d 385, 394 (1st Dist.2000), *State v. Tapp*, 5th Dist. Delaware No. 2006-CAA-090058, 2007-Ohio-2959, ¶ 57.

{¶50} Accordingly, Mr. Bates' second assignment of error is overruled.

III.

{¶51} Mr. Bates' first assignment of error is sustained in part and overruled in part. His convictions for burglary and arson are affirmed. The finding relative to the arson conviction regarding the value of the property or the amount of physical harm involved is reversed. Mr. Bates' second assignment of error is overruled. The judgment of the Medina County Court of Common Pleas is affirmed in part, reversed in part, and this matter remanded for resentencing on the arson conviction consistent with this opinion.

Judgment affirmed in part,
reversed part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
CARLA MOORE
FOR THE COURT

BELFANCE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

DAVID V. GEDROCK, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.