[Cite as *State v. Lamb*, 2018-Ohio-3089.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio                                    Court of Appeals No. F-17-002

    Appellee                              Trial Court No. 15CR000069

v.

Rickey Lamb, Jr.                              **DECISION AND JUDGMENT**

    Appellant                             Decided:  August 3, 2018

* * * * *

Scott A. Haselman, Fulton County Prosecuting Attorney,
for appellee.

Karin L. Coble, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} Rickey T. Lamb, Jr., appeals from a judgment of the Fulton County Court of Common Pleas finding him guilty of aggravated arson, insurance fraud, grand theft, communications fraud, and falsification in a theft.  For the reasons that follow, we affirm the judgment of the trial court.

**{¶ 2}** On July 21, 2015, the Fulton County Grand Jury issued a seven-count indictment charging appellant with one count of arson in violation of R.C. 2909.03(A)(2), a felony of the fourth degree ("Count 1"); one count of aggravated arson in violation of R.C. 2909.02(A)(2), a felony of the second degree ("Count 2"); one count of aggravated arson in violation of R.C. 2909.02(A)(1), a felony of the first degree ("Count 3"); one count of insurance fraud in violation of R.C. 2913.47(B)(1) ("Count 4"); one count of grand theft in violation of R.C. 2913.02(A)(3), a felony of the fourth degree ("Count 5"); one count of telecommunications fraud in violation of R.C. 2913.05(A) ("Count 6"); and one count of falsification in a theft offense in violation of R.C. 2921.13(A)(9), a felony of the fourth degree ("Count 7").

**{¶ 3}** Appellant was tried by a jury. The relevant facts follow.

### The Landlords

**{¶ 4}** In July 2014, Aaron and Sarah Klopfenstein purchased a home at 104 Ash Street, Lyons, Fulton County, Ohio, as an investment property (the "Ash Street home"). The structure was in good condition with no signs of water damage or electrical problems. When Ohio Gas went to the property to turn on the natural gas, they did a pressure check and found that there was a small leak at the furnace. After a contractor fixed the leak, Ohio Gas completed a second pressure check. The pressure levels were acceptable and the gas was turned on.

**{¶ 5}** On August 30, 2014, appellant and his wife, Desteny Lamb, entered into a one-year lease agreement for the Ash Street home. The lease included use of the home's

2.

refrigerator, stove, washer, and dryer. Appellant and his wife paid the first and last month's rent for a total of $1,400. Mr. Klopfenstein recommended the Lambs purchase tenant insurance. Desteny purchased a tenant insurance policy from Nationwide Insurance Company. The policy took effect November 2, 2014.

{¶ 6} A week after the Lamb family moved into the home, appellant contacted Mr. Klopfenstein by phone indicating that the freezer was not getting cold enough. Later that day, Mr. Klopfenstein bought a new refrigerator and delivered it to the Ash Street home.

{¶ 7} On December 22, 2014, Mr. Klopfenstein received a text message from appellant indicating that the home's utility room "smelled like natural gas." Appellant indicated that he hired a "gas contractor" to check for leaks, but the contractor could not find any. So, they "aired out" the utility room. Mr. Klopfenstein offered to have his plumbing and heating contractor check for a leak, but appellant indicated that the visit was not necessary; appellant had purchased a "detector" and felt "safe." At trial, Mr. Klopfenstein testified that the Lambs never asserted any other complaints about the condition of the Ash Street home.

{¶ 8} Just before the end of December 2014, appellant texted Mr. Klopfenstein to let him know that they would not be able to pay the January 2015 rent until the fourth or fifth of the month. In light of the holidays, Mr. Klopfenstein was willing to accept a late payment.

3.

**Christmas Party Plans**

{¶ 9} Janell Phillips is Desteny's mother. At trial, Janell testified that a few weeks before the fire, the family made plans to celebrate Christmas on January 3, 2015, at the Ash Street home.

{¶ 10} On the evening of the party, Janell drove out to Lyons in her silver Dodge Avenger. Janell's daughter, Madison, and boyfriend, Richard Garza, rode with her. They arrived at the Ash Street Home at about 5:00 p.m. She backed the car into the driveway so that they could "unload [their] stuff and go in the house." Janell testified that when they arrived, they went into the house through the front door. Only Desteny and the children were home when Janell and her family arrived. Janell indicated that for the short time she was in the home she stayed in the front room and kitchen. She never went into the utility room and she never smelled any natural gas. Janell testified that there was some discussion that Janell's nieces were not going to make it to the Christmas party because of inclement weather.

{¶ 11} When appellant arrived at the Ash Street home, he, Janell and Desteny made the decision to change the venue of the Christmas party. They made plans to meet Janell's nieces in Toledo at the Texas Roadhouse. Janell went outside and moved her car closer to the front door so they could load the car. Janelle explained that she, Madison, appellant's four-year-old son, and appellant were the last four people to walk out of the house. She indicated that while she was putting appellant's son into his car seat, appellant went back to the front door, "opened it and grabbed a package on a ledge that

4.

was by the door." Appellant then closed the door and they all left for Toledo. Janell pulled her car out onto the street first and appellant pulled out behind her. Janell testified that she, Madison, and Richard were at the Ash Street home for "about 20 minutes."

{¶ 12} When asked at trial whether the family planned on going to Janell's house after dinner, Janell responded in the negative.

### The Man who Called 911

{¶ 13} Scott Westbrook is the general manager of Aarons Sales and Lease, a rent-to-own company located in Wauseon, Ohio. On January 3, 2015, at approximately 5:20 p.m., Mr. Westbrook was driving north toward Lyons on County Road 10-3 when he noticed a red or maroon SUV driving recklessly in a southerly direction. He was approximately one mile outside of the Lyons city limits. When he arrived in Lyons moments later, Mr. Westbrook observed "flames coming out of the side of [a] house." It was appellant's Ash Street home. Mr. Westbrook grabbed his phone and called 911. After he parked his vehicle, he went to the front door of the home directly west of the Ash Street home and informed its inhabitants of the fire.

{¶ 14} A few days after the fire, Mr. Westbrook saw a post on social media indicating that the Lamb family had lost all of its possessions in the fire. Shortly thereafter, Mr. Westbrook volunteered to collect donations for the Lamb family at his rent-to-own store in Wauseon. Numerous community members donated clothing, toys, and home goods to the Lamb family.

{¶ 15} At trial, Mr. Westbrook was asked if he remembered appellant saying anything to him about the donations or the fire. Mr. Westbrook testified:

> [The Lambs] were happy about the donations, you know, and then we started talking and I let them know I actually called the fire in and they were like, oh, do you know what time it was, do you have any pictures, I was like no, you know, I don't have pictures of it, I was on the phone [with 911].

In regard to the cause of the fire, Mr. Westbrook testified that appellant and Desteny indicated that they were told the fire was "electrical."

### The Next Door Neighbors

{¶ 16} Edward Green lives in the home directly west of the Ash Street home. The Lambs' driveway marked the boundary between the two properties. Just before 5:00 p.m. on January 3, 2015, Mr. Green noticed a vehicle parked in appellant's driveway. He could not tell what kind of vehicle it was because its lights were shining into Mr. Green's house. He saw people moving around, but could not tell how many people were outside. He could also hear people walking on the back deck of appellant's home.

{¶ 17} At about the same time, Mr. Green's teenage son noticed appellant's dark red jeep in the driveway of appellant's home. He saw appellant go in and out of the home's back door, over the back deck. The teenage son did not recall seeing anyone else at appellant's house at the time, nor did he recall seeing any other cars. He did recall, however, seeing appellant's vehicle leave the house "around 5:00." The teenage son left

6.

his father's home at about 5:20 p.m. At that time, he did not notice any flames coming out of appellant's house. Just after 5:30 p.m., a man (Mr. Westbrook) came to Mr. Green's front door. According to a police report, Mr. Green called 911 to report the fire at 5:35 p.m.

### Firefighters Arrive on Scene

{¶ 18} Robert Sayers is a volunteer firefighter for the Metamora Fire Department. His department responded to the fire at the Ash Street home. Mr. Sayers testified that when he arrived, the Lyons fire department had already "knocked down" the fire "in the outer front window." Mr. Sayers and his crew were sent around to "make entry into the back of the house for fire suppression." He explained:

> We entered into the rear of the home. We started [to] head towards, we went through the utility room, we were only there maybe thirty to forty-five seconds before we were pulled out by [a] Morenci firefighter, he was acting as my door man which he helps pull holes and kind of keeps track of us. He pulled us out because he heard a hissing sound, at that time we just pulled out because that is what we were told to do.

{¶ 19} Mr. Sayers testified that on his way out of the Ash Street home, he heard a hissing sound "back by the back door." He was wearing a mask and using a sealed breathing system. He did not detect the odor of gas. Once Mr. Sayers received word that the gas was turned off, he and his crew went back into the Ash Street home. He did not hear the hissing sound upon reentry.

7.

{¶ 20} Cory Holt is a volunteer firefighter for the Morenci Fire Department. His department responded to the fire at the Ash Street home. Mr. Holt testified that after his department knocked down the fire in the front of the house, he went around the back to see how he could help other crews. As soon as he entered the structure through the back door, he could smell natural gas. He immediately ordered the crew out of the structure. At the time, Mr. Holt was wearing his mask, but his sealed breathing system was not turned on.

### News of the Fire and the Lambs Reaction to It

{¶ 21} On the evening of January 3, 2015, Sarah Klopfenstein received a text message from her mother indicating there was a house fire in Lyons, Ohio. At 6:28 p.m. Mrs. Klopfenstein sent appellant a text message: "Hi Rick, this is Sarah Klopfenstein. I just heard from my mom that there is a house fire in Lyons, she thought near there. Checking in to make sure it isn't ours."

{¶ 22} Appellant called Mrs. Klopfenstein and told her he had not heard anything about a fire and that he was "quite a ways away from home" at the Texas Roadhouse "on the other side of Toledo." Appellant then informed Mrs. Klopfenstein that they were about to be seated and to keep him informed if she heard anything else.

{¶ 23} Mrs. Klopfenstein called the Lyons Fire Department. She learned that the Ash Street home was on fire. Mrs. Klopfenstein called her husband and shared with him what she had learned. She then called appellant.

8.

{¶ 24} Appellant and his family drove back to Lyons. When they arrived at the house, appellant told firefighters that he had $20,000 in a metal box on the second floor in or near a dresser. Appellant also told firefighters that he had a number of firearms in the Ash Street home. Once the fire was under control, two firefighters searched the upstairs bedroom for appellant's metal box. They were unable to locate it.

{¶ 25} By the time Mr. Klopfenstein arrived in Lyons, the fire was extinguished. He drove to the fire station to learn more about what had happened. Appellant and his wife were at the station. Mr. Klopfenstein asked appellant if he and Desteny had purchased the recommended tenant's insurance. Appellant was unsure. Mr. Klopfenstein encouraged him to look it up online. Appellant did. Mr. Klopfenstein testified that according to the Nationwide Insurance website, the Lambs had about $60,000 in personal property coverage. At the time, appellant expressed his concern that the policy only covered $500 in cash. According to appellant, he had $20,000 in cash in a box in the Ash Street home.

{¶ 26} At trial, Mr. Klopfenstein was asked to describe Desteny's demeanor the night of the fire. Mr. Klopfenstein asserted, "Honestly she wouldn't even look at me. That was the thing that stood out to me, you know, I tried comforting her, I mean, the thing is, I don't know how my wife would react in that situation[.]" He further asserted, "I kind of thought, you know, maybe she feels guilty about this happening, I don't know."

9.

**{¶ 27}** A few days later, appellant sent Mr. Klopfenstein a text message asking to get the deposit back. Mr. Klopfenstein wrote appellant a check for $700. When asked why he returned the deposit to appellant, Mr. Klopfenstein stated, "I was just trying to do the right thing."

**Appellant's Interactions with a Nationwide Insurance Adjustor**

**{¶ 28}** Tricia Huberty is employed as an adjustor at Nationwide Insurance. After the fire, Ms. Huberty was assigned to appellant's file. She testified that the Lambs had personal property replacement cost coverage in the amount of $60,500 with additional living coverage in the amount of $12,100.

**{¶ 29}** Ms. Huberty indicated that she spoke with appellant by telephone the day after the fire. Two days after the fire Ms. Huberty conducted an in-person interview with appellant. The in-person interview was recorded and a transcription of the interview was admitted into evidence.

**{¶ 30}** During the in-person interview, appellant informed Ms. Huberty that, as a self-employed contractor, he made $82,000 in 2013 and $77,000 in 2014. He also informed Ms. Huberty that his wife and children were receiving Medicaid and "food stamps."

**{¶ 31}** During the interview, Ms. Huberty asked appellant what he and his family were doing in the hours leading up to the fire. Appellant responded:

> I was, you know, getting the last minute Christmas stuff together.
>
> We were going to have a Christmas party with her side of the family. They

were all going to come over and I finished with all the shopping. And on my way back. Uh, both her sisters cancelled on us. And they said that the roads were too slick. And my wife proposed the idea of just going to Texas Roadhouse and then going to her mom's house. Because her mom lives like a few minutes away from there.

* * *

So her mom was already there. And everyone was all upset that no one was coming. So we just decided that we would just go to Texas Roadhouse and then go to the, uh, her mom's place in west Toledo right after. So I got home, I jumped in the shower. We visited for a few minutes. I know we left at like 4:47 or so.

{¶ 32} During the interview, appellant informed Ms. Huberty that he had purchased the stove and fridge and that he was in the process of buying the washer and dryer from the landlord. In regard to the condition of the Ash Street home, appellant exclaimed:

Uh, the house was in really good condition when we moved in. We noticed today with the Fire Marshal that * * * the electrical was redone multiple times in the living room. And * * * that fourteen gauge wire was used when Ohio Code is twelve. And * * * that it wasn't up to code and should have been inspected. And but you could, like plug like a heater in

one outlet but you couldn't have the TV on in another outlet or else the fuses break.

Appellant explained to Ms. Huberty that in the short time he and his family lived at the Ash Street home the fuses "popped like thirty or forty times." When asked if he had informed the landlord about the fuse issue, appellant indicated in the affirmative. Appellant also indicated that the night before the fire, it was raining really bad and "there was like water that was like pooling below the electrical outlet. Like I guess in the wall and the carpet was wet." Appellant also noted that there was water in the dome light in the kitchen. And that he saw water "trickle down on a light bulb." Appellant explained that a few weeks before the fire there was a really bad gas smell in the house and that a contractor "came out and they tested it and they said there was nothing." When asked who the contractor was, appellant indicated to Ms. Huberty that he had found him on Craigslist. Appellant went on to explain, "but you know, once we aired [the room] out, it didn't smell or anything until the night before the fire, it smelled really, really, really bad. And I went back there and found a crack in the pipe in the line that was going from the house to the dryer * * * so I just turned the gas off and everything." Appellant offered the following explanation for the hole in the line, "I pushed the dryer back it like bent the line and split."

{¶ 33} Ms. Huberty read to the jury the extensive list of household and personal items the Lamb family claimed to have lost in the fire. The list included, $29,163 worth of Hallmark cards; $2,110 worth of DVDs; a $2,499 sectional sofa; a $2,000 Rolex;

12.

$3,000 worth of school books; a $6,000 camera; a $1,200 pressure washer; a $799 fridge; a $499 stove; a $200 washer; a $200 dryer; a $400 kayak; a $2,700 Vera Wang wedding dress; numerous guns; a $5,599 ring; $20,000 cash; and numerous other items. Appellant's claimed losses totaled $110,000.

{¶ 34} When Ms. Huberty asked about the status of the lease agreement, appellant indicated that he had paid his rent through July 2015. When Ms. Huberty asked appellant for his landlord's phone number, appellant indicated that he did not have a phone number for Mr. Klopfenstein.

{¶ 35} Shortly after the in-person interview, Ms. Huberty obtained a credit report and discovered that the Lambs had recently gone through bankruptcy. She also discovered that the fire occurred less than six months after the policy's effective date. The presence of these indicators required Ms. Huberty to forward the file to Nationwide's Special Investigative Unit.

**Nationwide's Special Investigative Unit**

{¶ 36} Christopher Lease is a special investigator for Nationwide's Special Investigative Unit. Mr. Lease conducted two interviews with appellant and attended appellant's examination under oath. All three events were recorded and transcribed. The transcripts were presented to the jury at trial.

{¶ 37} The first interview took place on January 20, 2015. During that interview, appellant indicated that the cash lost in the fire was in a plastic storage container underneath the dresser in the master bedroom. Appellant modified his earlier statement

13.

regarding his payments under the lease agreement; rather than the rent being paid through the end of July 2015, appellant indicated that the rent was only paid through the end of March 2015. He further indicated that despite paying his rent ahead of schedule, the landlord had not issued him a refund.

{¶ 38} In regard to the appliances, appellant asserted that he was in the process of purchasing the refrigerator from the landlord. Appellant indicated that he and his wife owned the home's stove, washer, and dryer. Appellant admitted that claims made in a GoFundMe crowdfunding account opened by his aunt asserting that the Lamb family had "lost everything" in a fire and did not have insurance were untrue. Appellant asserted that he was not in contact with his aunt and did not make any effort to correct the false GoFundMe story.

{¶ 39} Appellant admitted that he was not truthful when he made a claim to a local newspaper reporter that the loss would not be covered by insurance. Notably, at the time of the newspaper interview, Nationwide had already provided appellant's family with a $5,000 advance towards the loss.

{¶ 40} During a February 2, 2015 interview with Mr. Lease, appellant asserted that on the night of the fire he and his family left the Ash Street home sometime between 4:45 and 5:00 p.m. Appellant indicated that his mother-in-law arrived sometime between 4:30 and 4:40 p.m. Initially during the interview, appellant indicated that his four-year-old son was the last one out of the house. Later in the interview, however, appellant

14.

admitted that he was the last one in the house the night of the fire, but just to grab a gift that was "right on the inside of the door." He denied going all the way inside the house.

{¶ 41} When asked whether he had gone inside the house after the fire, appellant indicated that he had gone in with investigators. He also indicated, however, that either one or two days after the fire, he went back to the house to remove his beard trimmers, a sleeping bag, and some toys.

{¶ 42} In regard to the gas leak, appellant told Mr. Lease that about two weeks before the fire, he smelled gas and called a contractor off of Craigslist to check it out. Appellant indicated that the contractor was unable to find any problems. According to appellant, the contractor told him to "air out the back room."

{¶ 43} Appellant indicated that on the day before the fire he smelled gas again. This time, he pulled the dryer out from the wall, looked down, and saw a "split" in the gas line. He turned off the gas. When asked if he had informed Mr. Klopfenstein about the gas smell and the hole in the gas line, appellant responded, "I told him everything." Appellant further indicated that he told Mr. Klopfenstein that the roof was leaking and water was "pooling up at the outlet and on the floor."

{¶ 44} During the March 17, 2015 examination under oath, appellant indicated that his four-year-old son was the last person out of the house. Appellant asserted that he contacted Mr. Klopfenstein a few weeks before the fire to inform him about the odor of natural gas and that he hired a contractor off of Craigslist to find the leak. Appellant admitted, however, that when he gave his landlord a phone number for the contractor, it

15.

was not the contractor's real number but one he "made up" to get the landlord off his back.

{¶ 45} Appellant explained that on January 1, 2015, two days before the fire, he and his wife smelled natural gas again. This time, he pulled the dryer out and found a crack in the gas line. He wrapped the crack with tape. When he went back to check the dryer again the following day, he found a second split in the line. That time, he turned off the valve that supplied gas to the dryer. Appellant denied knowing what caused the cracks in the gas line and denied cutting the line.

{¶ 46} When asked to explain why investigators found a burnt match behind the dryer, appellant explained:

> We have a burn barrel out in the back, and when it was cold out, I'd put the cardboard and everything in the burn barrel, and I'd light a piece of paper on fire inside the back room, so I didn't have to stand out there and try to light it on fire. I'd strike, light it, blow it out, either set it on the dryer or set it on the shelf above the dryer. Put the fire in the fire pit, close the door, call it a day.

{¶ 47} During the examination, appellant stated that he never informed Mr. Klopfenstein about the problems he was having with the breakers. He insisted that his rent had been paid through April 2015.

**{¶ 48}** Appellant explained that at 11:30 p.m. on February 15, 2015, he and his family went to a location on Sylvania Avenue and lost $15,000 in cash to "some guy that was an investor." He refused to discuss the matter any further.

**Robert Moody's Investigation**

**{¶ 49}** Robert Moody is a fire investigator employed by Nederveld Engineering. He was retained by Nationwide Insurance, to conduct an "origin and cause" investigation at the Ash Street home.

**{¶ 50}** Mr. Moody met appellant at the site of the fire on January 6, 2015, three days after the fire. In a brief, pre-walkthrough interview, appellant explained to Mr. Moody that he and his family left the Ash Street home at 4:43 p.m. on January 3, 2015, and that the fire started at "5:30 or so." Appellant indicated that he knew he was "underinsured" and that they had "lost everything" including a gun collection, a "considerable amount of cash," and his wife's "greeting card collection."

**{¶ 51}** Appellant reported that prior to the fire there were a few things in the house that "got his attention" including "a pool of water on the living room floor with water dripping from a wall plug." He also indicated that a light in the kitchen ceiling had some water in it and that there were "major electrical problems in the house." Appellant explained that breakers tripped when too many things were plugged in at one time.

**{¶ 52}** When asked about the condition of the house prior to leaving on the night of the fire, appellant indicated that "everything was fine" when he left. Appellant reported, however, that several days before the fire he encountered an "eggy smell" in the

17.

house. He tried to track down the source of the smell and found a "hole" in the gas supply line leading to the dryer.

{¶ 53} Appellant indicated that he had purchased a live Christmas tree the day after Thanksgiving. On the night of the fire, the tree was up, and decorated. Appellant suggested that when the family left the home for the last time, the tree's lights were on.

{¶ 54} Appellant stated that in December 2014, he had purchased three ceramic heaters and placed them in various locations on the first floor of the home. On the night of the fire, one heater was placed in the doorway leading to the kitchen, one was in the living room, and one was in the dining area of the home. Appellant reported that he did not believe any of the heaters were on when he and his family left the home for the last time.

{¶ 55} After the interview, Mr. Moody began a physical examination of both the inside and the outside of the fire-damaged structure. He described to the jury what he saw.

{¶ 56} On January 29, 2015, at the request of Nationwide Insurance, Mr. Moody went back to the fire-damaged structure. He worked with other fire experts to thaw out, sift through, and clean up piles of fire-damaged debris inside the home.

{¶ 57} Mr. Moody testified that they found what appeared to be remnants from a space heater and a single magazine to a small caliber hand gun. When Mr. Moody went to the upstairs bedroom, he found no evidence of the $20,000 in cash and no evidence of

18.

any other guns. The bedroom contents had suffered soot damage, most of the personal effects were not damaged by flame and were all readily identifiable.

{¶ 58} Mr. Moody testified that in a report dated February 16, 2015, he opined that the fire originated in the living room. He indicated, however, that he could not identify a "competent ignition source, or the fuel that was first ignited."

{¶ 59} Mr. Moody found no evidence of the water damage to or around the outlet appellant had mentioned during the interview. He found the home's utility room was largely intact, with no real fire or flame damage, only melted plastic and soot. In regard to the dryer, Mr. Moody testified:

> I took a look at [the dryer] and actually photographed that connection in the back because Mr. Lamb said that he had had a problem with that connection. So I did look at that. I photographed it. And I did note that there was a * * * hole in the gas line. A tear or a hole in the gas line. And that the supply valve from the riser that supplied the gas to the dryer was in the off position.

{¶ 60} Mr. Moody harvested the gas line behind the dryer and sent it to a metallurgist for examination. While harvesting, he found a burnt match stick at the base of the gas riser.

**Dr. Elizabeth Buc**

{¶ 61} Dr. Elizabeth Buc is a metallurgist. She is employed by the Fire and Materials Research Laboratory in Lavonia, Michigan. Dr. Buc was hired by Robert

19.

Moody to evaluate the flexible gas line that had been attached to the dryer in the utility room of the Ash Street home. At trial, Dr. Buc testified that two holes on the gas line showed evidence of intentional mechanical damage most likely caused by a sharp cutting tool. One hole was covered with tape.

## Frank Reitmeier's Investigation

{¶ 62} Assistant Fire Marshall Frank Reitmeier is employed by the State Fire Marshall's Office as an investigator in the Fire and Explosion Investigation Bureau. He was assigned to investigate the Ash Street fire. At trial, Mr. Reitmeier opined that the fire started in the living room and noted that there was "no indication that the fire started in the wall cavities or in the ceiling cavities." Mr. Reitmeier was not able to identify the fire's cause or source of ignition. Nonetheless, Mr. Reitmeier explained that his opinion regarding the classification of the fire ultimately changed from "undetermined" to "incendiary" after he learned more about the timeline of events and reviewed appellant's phone records and recorded statements.

## Desteny Lamb

{¶ 63} At the time of trial, Desteny and appellant had four children together ranging from four months to six years of age. Desteny testified that she bought their Christmas tree on Black Friday and that by January 3, 2015, it was drying out and "needles would fall out whenever it got knocked or bumped."

{¶ 64} Desteny testified that a week or two before the fire, she and appellant smelled natural gas in the utility room. She further testified that they discovered the

20.

cause of the smell—a small nick in the gas line behind the dryer. She explained, "[i]t appeared that one of the tools that were on the shelf above the dryer had fallen off and hit it." Instead of replacing the line, they put tape over the hole. She said the make-shift repair did not "get the dryer going again" and they were still smelling gas. When asked what they did next, the following exchanged occurred:

Then [appellant] contacted [the landlord] to see what he should do about it. [The landlord] sounded like he was frustrated. So [appellant] decided that he would replace the gas line himself.

Desteny indicated that appellant planned to replace the gas line the evening of the family Christmas party with the help of her mother's boyfriend. Unfortunately, appellant was not able to complete the repair because of the last-minute change in venue.

{¶ 65} Desteny testified that her mom arrived at the house at 5:05 p.m. on January 3, 2015, and that appellant came home two or three minutes later. Desteny also indicated that they all left for the restaurant about 10 minutes after her guests arrived, at approximately 5:15 p.m. Desteny denied smelling natural gas in the home on January 2, 2015.

{¶ 66} Desteny admitted that she and appellant lied to Nationwide about the value of their possessions. She also admitted that they lied to Nationwide about owning the appliances in the Ash Street home. She explained that they lied because "they wanted to get the insurance claim up."

21.

## The Verdict and Sentencing

{¶ 67} The jury acquitted appellant on Count 3, but convicted him on all remaining counts. The trial court merged the convictions for Counts 1 and 2, and the state elected to proceed to sentencing on Count 2. At the sentencing hearing, appellant was ordered to serve a term of six years in prison on Count 2, eleven months in prison on Count 4, eleven months in prison on Count 5, eleven months in prison on Count 6, and eleven months in prison on Count 7. The sentences were ordered to be served concurrently. The trial court also ordered appellant to pay $8,381.07 in restitution to the State Fire Marshall's Office and $18,500 in restitution to Nationwide Insurance. In its judgment entry, the trial court stated that appellant was ordered "to pay all prosecution costs, court-appointed counsel fees and any fees permitted pursuant to [R.C.] 2929.18(A)(4)."

{¶ 68} Appellant does not challenge the theft or fraud convictions on appeal. He does, however, challenge the aggravated arson conviction found in Count 2 and certain costs imposed in the judgment entry.

## First Assignment of Error

{¶ 69} In his first assignment of error, appellant asserts: "Plain error occurred when the State's expert witnesses were permitted to render opinions without being certified as experts and without stating their opinions to a reasonable degree of scientific certainty."

22.

{¶ 70} In his first argument under his first assignment of error, appellant claims that the trial court erred when it allowed the state to present expert testimony without first certifying the witnesses as experts under Evid.R. 104. "Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert[.]" *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶114, citing *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 446 N.E.2d 444 (1983). While it is clear that the state never formally tendered Mr. Moody, Mr. Reitmeier, and Dr. Buc as experts, defense counsel never challenged their qualifications to testify. Thus, appellant has waived all but plain error. Crim.R. 52(B). *See State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 37.

{¶ 71} Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In *State v. Barnes*, 94 Ohio St.3d 21, 759 N.E.2d 1240 (2002), the Supreme Court of Ohio explained:

> By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, *i.e.*, a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's

error must have affected the outcome of the trial. (Citations omitted). *Id.* at 27.

**{¶ 72}** Notice of plain error is taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. The Supreme Court has "repeatedly found that no plain error occurs when the state fails to formally tender an expert." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 124.

**{¶ 73}** Previously, we have held that "one is qualified as an expert witness so as to properly provide expert testimony if the testimony provided exceeds the knowledge or experience possessed by a layperson, possesses specialized knowledge, skill, experience, training and education regarding the subject matter, and the testimony is based upon reliable specialized information." *JMR Marine Consulting LLC. v. Liberty Aviation Museum, Inc.*, 6th Dist. Ottawa No. OT-16-024, 2017-Ohio-5686, ¶ 28. *See* Evid.R. 702.

**{¶ 74}** As stated above, Robert Moody is a fire investigator employed by Nederveld Engineering. Our review of the record indicates that Mr. Moody was qualified to testify as an expert fire investigator because of his specialized knowledge, skill, and experience regarding the subject matter. Before testifying about his observations at the fire scene and conclusions about where the fire started, Mr. Moody explained that he had been working with Nederveld as an investigator for five and one-half years. Prior to that, he worked as a firefighter for 33 years. He attended his first fire investigation class in

24.

1974.  Mr. Moody holds an associate's degree in fire technology and a bachelor's degree in public safety management.  We find no merit in appellant's argument that the trial court committed plain error when it allowed the state to present the expert testimony of Mr. Moody.

{¶ 75} Similarly, our review of the record indicates that Mr. Reitmeier was qualified to testify as an expert fire investigator because of his specialized knowledge and experience in the field.  Before offering his expert opinion, Mr. Reitmeier testified that he began his career in the fire service in 1976.  He took his first fire investigation class in 1978.  Since that time, Mr. Reitmeier has taken hundreds of fire investigation and determination classes.  During the course of his career, Mr. Reitmeier has been involved in the investigation of over 2,500 fires.  We find no merit in appellant's argument that the trial court committed plain error when it allowed the state to present the expert testimony of Mr. Reitmeier.

{¶ 76} Dr. Elizabeth Buc is a metallurgist.  Our review of the record indicates that Dr. Buc was qualified to testify as an expert because of her educations, specialized knowledge, and experience in her field.  Before offering her expert opinion, Dr. Buc testified that she holds a bachelor's degree in chemistry, a master's degree in chemistry, and a PhD in materials science and engineering.  She is a licensed fire investigator and metallurgical engineer.  During the course of her career, Dr. Buc has testified as an expert 10-12 times.  We find no merit in appellant's argument that the trial court committed plain error when it allowed the state to present the expert testimony of Dr. Buc.

25.

{¶ 77} It is clear that the experience and training of the aforementioned witnesses qualify them to testify as expert witnesses at trial. Each testified extensively as to their training and experience. Each were cross-examined on their opinions, methods, and observations. The trial court's failure to specifically certify Mr. Moody, Mr. Reitmeier and Dr. Buc as experts did not result in plain error. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 146 ("a trial court is not required to expressly state on the record that the witness is qualified as an expert prior to that witness offering opinion testimony."). Accordingly, we find no merit in appellant's first argument under his first assignment of error.

{¶ 78} In his second argument under his first assignment of error, appellant asserts that five statements made by Mr. Reitmeier at trial should have been excluded because they "are not scientifically reliable" and were not presented "to a reasonable degree of scientific certainty." Appellant did not object to the statements at trial. Thus, his claims are reviewable only for plain error.

{¶ 79} The first statement involves the flexible gas line leading to the dryer in the utility room of the Ash Street home. At trial, Mr. Reitmeier testified that when he made a post-fire visit to the Ash Street home, he noted that the gas valve behind the dryer was in the "off" position. Later in his investigation, however, he concluded that the gas valve must have been on when the fire started and that someone "reached behind the dryer and turned it off" after the fire. Mr. Reitmeier admitted that he had no "proof" that the valve had been turned off.

26.

**{¶ 80}** In *State v. Waldock*, 3d Dist. Seneca No. 13-14-22, 2015-Ohio-1079, the appellant argued that an expert's testimony was not admissible because it was based on assumptions made by the expert while performing his calculations. *Id.* at ¶ 61. The *Waldock* court disagreed. It held that the trial court did not err in allowing the expert's testimony because the expert's assumptions were based on facts supported by the record. *Id.* at ¶ 66. The *Waldock* court explained:

> An expert's testimony "must 'fit' under the facts of the case so that 'it will aid the jury in resolving a factual dispute.'" *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed.Appx. 781, 790 (3d Cir.2009), quoting *Lauria v. Natl. RR. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir.1998). "The 'fit' element has been described as encompassing 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Allstate Ins. Co. v. Hamilton Beach/Proctor-Silex, Inc.*, W.D.Pa No. 2:06CV1186, 2008 WL 3891259, *5 (Aug. 19, 2008), quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir.1985). Therefore, when the expert's testimony is logically connected to the questions at issue and assists the trier of fact to understand the evidence, the testimony is relevant. *Id.* However, when "expert testimony is based on assumptions that lack any factual support in the record[,]" the testimony should be excluded. *Id.*, citing *Stecyk v. Bell*

27.

*Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir.2002). *Waldock* at ¶ 65.

{¶ 81} Here, the assumptions Mr. Reitmeier made were based on facts supported in the record. Specifically, prior to Mr. Reitmeier taking the stand, the jury heard testimony that one firefighter smelled gas when he entered the utility room and that a second firefighter heard a "hissing" sound when he entered the room. Appellant visited the home on various occasions after the fire and on at least one occasion before the investigators arrived on scene. The dryer was next to the back door and the valve was easily accessible without moving the dryer. The jury also heard Dr. Buc explain, in detail, why she came to the conclusion that the hose connecting the dryer to the gas supply had suffered "intentional mechanical damage."

{¶ 82} Notably, all of the experts who testified at trial agreed that no fugitive gas ignited during the fire. Thus, whether the valve was in the "on" or "off" position at the time of the fire is of little consequence to the ultimate question of culpability. The gas did not start nor did it fuel the fire. Under a plain error analysis, we find that even if the trial court erred in allowing Mr. Reitmeier to testify as to his conclusion that the valve was in the "on" position at the time of the fire, any error was harmless.

{¶ 83} The second statement addressed by appellant in his brief involves some tools found near the dryer. At trial, Mr. Reitmeier stated:

> We didn't physically put [the tool] on the nut or physically put the pliers on the – on the pipe, or on the flex pipe because we didn't want to

28.

cause any additional damage. We just kind of aligned them up and said,

boy that's odd that a * * * adjustable wrench is set to the same size as that

nut.

Under our plain error analysis, we find that the trial court did not err in allowing Mr. Reitmeier to testify as a fact witness and relay his actual observations of the fire scene. This is particularly true in this instance because appellant admitted to investigators that he was working on the gas line prior to leaving the Ash Street home on the evening of the fire. Evidence that the adjustable wrench was set to the same size as the nut supports appellant's version of events.

{¶ 84} The third statement addressed by appellant in his brief involves appellant's space heaters. During trial, Mr. Reitmeier acknowledged that he could not state to a scientific certainty how the fire was started. He indicated that one of appellant's space heaters was found melted to the carpet near the doorway into the kitchen. Because of its location, he did not believe that heater ignited the fire. It is not clear whether remnants of the second or third space heater were ever found.

{¶ 85} Later in his testimony, Mr. Reitmeier was asked for his opinion as to what could have ignited the fire. Mr. Reitmeier testified:

Well, in – any numerous combustible materials that were in that

living room. The Christmas tree, the furniture, papers, cardboards, many

things. A simple lighting with a match, a wooden stick match, or a lighter,

or whatever could have started any number of those things on fire. Also the

29.

space heater that was on the north wall, after we – I realized the proximity of that heater to the tree could have been used to – as * * * a time delay device to purposely start that fire. It's – it's clear from my – my research that the space heaters too close to combustible materials can and do start fires.

{¶ 86} A review of Mr. Reitmeier's testimony—in its entirety—demonstrates that while he was unable to pinpoint with scientific accuracy what ignited the fire, he did suggest a number of combustible materials that could have been the source of ignition. Based on his observations and experience, Mr. Reitmeier was able to rule out a number of possible ignition sources (e.g. natural gas, electrical circuit, faulty wiring). Mr. Reitmeier's examination was lengthy and his cross-examination, rigorous. "Taking into account inconsistencies or conflicting evidence while weighing the credibility of an individual witness is well within the province of the jury." *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, ¶ 76 (7th Dist.). We find no merit in appellant's argument.

{¶ 87} Appellant's fourth area of concern involves Mr. Reitmeier's opinion as to whether or not the fire in the living room "flashed over." Appellant asserts that Mr. Reitmeier's testimony was contradictory. Again, it is well within the province of a jury to determine what testimony is worthy of belief and what testimony is not worthy of belief. We find no merit in appellant's argument.

30.

{¶ 88} Appellant's last area of concern under his first assignment of error involves Mr. Reitmeier's opinion that the fire was intentionally set. As stated above, Mr. Reitmeier initially classified the fire as "undetermined." He then changed the classification to "incendiary." Appellant argues that the incendiary classification is not based upon a reasonable degree of scientific certainty.

{¶ 89} At trial, Mr. Reitmeier repeatedly indicated that he could not identify what started the fire. When asked why he changed the classification, Mr. Reitmeier explained:

> I changed my opinion due to a number of things. The metallurgist's findings saying that those lines, the holes in those lines were purposely cut. The change in the time line, that we had a visible fire coming out the house within twelve minutes or less from when [appellant] left the residence. The – I made sure, on at least three occasions, I made sure that [the fire chief] went over things with the fire fighters to see exactly what they smelled, what they heard when they identified hearing the hissing and smelling the odor of natural gas in the back room. And then I basically determined at that point that the only logical explanation was that if you had a gas leak going on in the back room at the time of the fire, you have a purposely cut gas line, and then less than twelve minutes you have a fire after they were leaving, that a fire would have – the only logical thing was a fire was purposely set in that living room.

{¶ 90} Here, the assumptions Mr. Reitmeier made when categorizing the fire as "incendiary" were based on his experience as a fire investigator and unique facts in the record. There is evidence that appellant left his home no more than 20 minutes before a driver passing through town called 911 to report the fire. Also, a copy of appellant's phone bill was presented to the jury. The phone bill shows that calls were made between appellant and his wife at the same time the two of them—according to appellant's timeline—were traveling to Toledo in the same vehicle. For these reasons, we find no merit in appellant's argument.

{¶ 91} For the reasons set forth above, appellant's second argument under his first assignment of error is not well-taken.

### Second Assignment of Error

{¶ 92} In his second assignment of error, appellant asserts: "Appellant's conviction for aggravated arson is not supported by sufficient evidence."

{¶ 93} "A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 28, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When reviewing for the sufficiency of the evidence, an appellate court's function is to "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph

32.

two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 94} R.C. 2909.02(A)(2) provides that "[n]o person, by means of fire or explosion, shall knowingly * * * [c]ause physical harm to any occupied structure." R.C. 2909.01(C)(2) defines "[o]ccupied structure," in relevant part, as "any house, building, * * * or other structure * * * occupied as the permanent or temporary habitation of any person, whether or not any person is actually present."

{¶ 95} The crux of appellant's argument is the lack of direct evidence that the fire was intentionally set. He asserts, "[Mr.] Reitmeier was the only witness to conclude or opine that the fire was intentionally set, and this opinion is challenged [in appellant's first assignment of error]." Without rehashing our opinion regarding Mr. Reitmeier's expert testimony, we find that there was sufficient circumstantial evidence presented by the state, with or without Mr. Reitmeier's testimony, to persuade any rational trier of fact that appellant intentionally set the fire.

{¶ 96} "Circumstantial evidence" is defined as "[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought proved." *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* 221 (5th Ed.1979). "The distinction between direct and circumstantial evidence is that direct evidence can prove a fact by itself; circumstantial evidence proves a fact from which an

33.

inference of the existence of another fact may be drawn." *State v. Pointer*, 8th Dist. Cuyahoga No. 100608, 2014-Ohio-4081, ¶ 7.

{¶ 97} Here, there is no direct evidence that appellant intentionally started the fire. However, that deficiency does not preclude an arson conviction. "The courts have consistently noted that arson prosecutions rely heavily on circumstantial evidence." *Id*. at ¶ 12, citing *State v. Carter*, 8th Dist. Cuyahoga No. 99925, 2014-Ohio-926, ¶ 8; *State v. Pahlau*, 5th Dist. Stark No. 2006-CA-00010, 2006-Ohio-4051, ¶ 30. And, as in many criminal convictions, the credibility of the appellant is central to this case. "Ohio courts have held that the testimony of one witness, if believed by the jury, is sufficient to support a conviction. The issue of witness credibility is a matter within the province of the jury." *State v. Williams*, 5th Dist. Stark No. 2016 CA 00074, 2017-Ohio-803,¶ 54, citing *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990).

{¶ 98} Much of the evidence produced at trial focused on the fraudulent insurance claim appellant submitted to Nationwide Insurance. This evidence alone could not convince the average mind that appellant intentionally started the fire that led to the claim. However, in our review of the record, we find that the state presented sufficient circumstantial evidence of appellant's guilt on the aggravated arson charge.

{¶ 99} First and foremost, our attention is drawn to the timeline of events. The evidence, if believed, would demonstrate that appellant was the last person inside the Ash Street home and that he left the home no more than 20 minutes before the fire was reported to 911. Obvious signs of arson were not found. However, investigators ruled

34.

out a number of potential non-arson causes for the fire, including an electrical fire or faulty wiring. Why is this noteworthy? In part, because appellant reported to various individuals that he had been told by investigators that the fire was "electrical." At trial, the investigators denied ever reporting to appellant that the fire was in any way related to electricity.

{¶ 100} Appellant made numerous inconsistent statements to investigators on a number of topics. Notably, appellant was inconsistent in reporting the time he and his family left the home, when the damage to the gas line was discovered and what he did in response, whether and how many space heaters were on when they left the house, what he did and who he called when he discovered an "eggy smell" in the utility room, whether and to what extent his lease was paid, and the content and value of the personal property inside the home at the time of the fire. Appellant also made conflicting statements to others about when he discovered and to what extent he believed the fire was covered by insurance. Furthermore, appellant's statements about when he discovered and reported the cracks in the gas line were inconsistent with his wife's testimony about when the cracks were discovered and reported.

{¶ 101} Also relevant to our determination of the sufficiency of the evidence is Dr. Buc's testimony regarding the intentional mechanical damage to the dryer gas supply line, Mr. Reitmeier's conclusion that the fire was incendiary, and the first responders' observations upon their initial entrance into the utility room.

35.

**{¶ 102}** Construing all of the evidence in a light most favorable to the state, we find that appellant's aggravated arson conviction was supported by sufficient evidence. Thus, appellant's second assignment of error is not well-taken.

### Third Assignment of Error

**{¶ 103}** In his third assignment of error, appellant asserts: "The conviction for aggravated arson is against the manifest weight of the evidence."

**{¶ 104}** "A manifest weight of the evidence challenge contests the believability of the evidence presented." *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23. When determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences drawn from it, consider the witnesses' credibility, and decide whether in resolving any conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶ 105}** Above, we addressed appellant's credibility and the circumstantial evidence we found sufficient to support appellant's aggravated arson conviction. Here, we emphasize that "courts give weight to 'motive and opportunity [as] facts which can weigh heavily in establishing arson.'" *Pointer*, 2014-Ohio-4081 at ¶ 12, citing *State v. Pruiett*, 9th Dist. Summit No. 12858, 1987 Ohio App. LEXIS 6481, *3 (Apr. 15, 1987).

{¶ 106} It is clear from the evidence that appellant had both a motive and an opportunity to start the fire. Appellant and his wife were experiencing financial difficulties. In 2013, appellant and his wife filed Chapter 7 Bankruptcy. At the time of the fire, appellant's wife and children were receiving public assistance. Just days before the fire, appellant indicated he would be late in making his $700 rent payment for January 2015. Appellant's tenant insurance went into effect 64 days before the fire that destroyed the Ash Street home. Appellant's wife testified that they purposely inflated the replacement value of their possessions.

{¶ 107} Further, appellant had an opportunity to start the fire. Testimony from at least one witness suggests that appellant was the last person to leave the house.

{¶ 108} As discussed above, upon reporting the fire and during the subsequent fire investigation, appellant made numerous inconsistent statements about the days and hours leading up the fire, his family's finances, and the condition of the home both before and after the fire. During his initial interviews with fire investigators, appellant insisted that he and his family left the Ash Street home at 4:43 p.m. on January 3, 2015. Yet, phone log evidence and witness testimony revealed that appellant left the home no more than 20 minutes before the fire was reported to 911. The timeline was significant to Mr. Reitmeier's investigation and his ultimate determination that the fire was incendiary. And, one could conclude that the timeline was also significant to appellant: when he first met the man who called 911, appellant asked, "what time did you call 911?"

37.

{¶ 109} Appellant alleged that he notified the landlord of various water and electrical issues inside the home. The landlord denied these allegations. Fire investigators specifically determined that the fire was not caused by faulty wiring. Further, they found no evidence of interior pre-fire water damage.

{¶ 110} As to the fire itself, investigators learned that firefighters responding to the scene heard and/or smelled gas when they entered the home's utility room. While it was clear that the fire started in the home's living room—and that any fugitive gas, if any, failed to ignite—fire investigators were not able to pinpoint the actual cause of the fire.

{¶ 111} Mr. Reitmeier confirmed, hypothetically speaking, that a space heater placed next to a dry Christmas tree could ignite the tree. Appellant's wife indicated that the family's Christmas tree was dry and dropping its needles. She also indicated that despite the condition of the tree, a space heater was plugged into the outlet behind the tree.

{¶ 112} A reasonable fact finder could have inferred, and found beyond a reasonable doubt, that appellant set the fire that destroyed the Ash Street home. This is not the exceptional case in which the jury lost its way and created a manifest miscarriage of justice. *See Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, at ¶ 48. Therefore, appellant's third assignment of error is not well-taken.

38.

**Fourth Assignment of Error**

**{¶ 113}** In his fourth assignment of error, appellant asserts: "The trial court erred when it imposed costs in the judgment entry, without finding appellant had the ability to pay." Specifically, appellant contends that the trial court erred when it ordered him to pay $8,882.00 in court-appointed counsel fees without first determining his present and future ability to pay.

**{¶ 114}** While we agree that the trial court did not specifically find that appellant had the future ability to pay, the record does contain evidence that the trial court considered appellant's future ability to pay before ordering him to pay for his court-appointed counsel fees. *See State v. Ortiz*, 6th Dist. Lucas No. L-14-1251, 2016-Ohio-974, ¶ 38 ("Prior to imposition of costs of assigned counsel * * * the court is not required to conduct a hearing on a defendant's ability to pay; rather, the record must contain some evidence that the court considered the defendant's financial ability to pay."). In fact, appellant himself insisted during the sentencing hearing that he had the ability to pay back all that was owed. While asking the court to consider placing him on house arrest appellant asserted, "I will pay back every penny owed. I will pay back that all promptly. Fire Marshall's cost, Nationwide Insurance cost, Nationwide's labor cost, anything that is owed to the court I will pay back openly and willingly." Appellant indicated that he made a "game plan." He declared that his arrest had "changed" him. Appellant asserted:

I've put everything into my marriage. Everything into my parenting.

And lastly my heart into my work. I over-achieved, provided, established

contacts, made money and we purchased our first house in Maumee, paying cash, a newer SUV, we paid cash as well, and a truck, and I paid cash for that as well. I made it. * * * I'm the owner, operator, and founder for Lamb Contracting. What started as a struggling, low profit business turned into a highly recommended company.

Based on appellant's promises to pay and the court's familiarity with the case, the trial court was well-positioned to consider appellant's future ability to pay court-appointed counsel fees. Appellant's fourth assignment of error is not well-taken.

### Conclusion

{¶ 115} The judgment of the Fulton County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

James D. Jensen, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.